## THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. DANIEL MOLNAR, JR., PLAINTIFF IN ERROR.

Argued May 15, 1945—Decided September 27, 1945.

For the State of New Jersey, defendant in error, *John A. Lynch,* prosecutor.

For the plaintiff in error, *Morris Spritzer* and *George L. Burton.*

The opinion of the court was delivered by

CASE, J.   Plaintiff in error was found guilty by a Middlesex County jury of murder in the first degree and was thereupon sentenced by the court to death.   The case comes up on assignments under a strict writ of error and also on specifications for reversal under a certification of the entire record. The following facts were in evidence.   In all essential respects they came from Molnar, himself, whom we shall refer to as the defendant, either in his proved confessions, or in his testimony at the trial, or in both.   His testimony did not vary materially from his proved confessions.

Defendant had been married for about four years to Anna Rozanski, a daughter of Adam Rozanski.   There was one child of the marriage, aged two and one-half years.   Disagreements came, accompanied by court hearings and followed by a separation which began about nine months before the date of the crime charged in the indictment.   During the separation defendant lived with his mother, and his wife resided with her father.   The infant child of the marriage was, under an order of custody given by the court a few days earlier, with the wife at the time of the crime.   Defendant nursed grievances against his wife and her family because of the "lies" that he believed they had told about him, with the result that he conceived the idea of killing his wife and, later, of killing her entire family, especially her father.   He owned a "22" calibre rifle and two "32" calibre revolvers.   Two or three days before the tragedy he exchanged his smaller revolvers for a "38" calibre revolver.   His purpose in wanting the larger weapon, so he said, was "to kill the wife and the family and whoever else I could grab hold of."   On December 7th, 1944, he went forth to execute a deliberated plan to kill, and definitely to kill his wife and her father.   He placed the revolver, loaded with five bullet cartridges, under his belt beneath his vest.

He "broke" the rifle so that it could be folded, and he wrapped it, as thus folded, in a newspaper and carried the same as a parcel. He placed the cartridge clip of the rifle, loaded with shells, in his pocket, as also a further supply of loose cartridges. Thus armed to kill and with the purpose to kill he sought and found his selected and unsuspecting victims at their home. The confession reads:

"Q. When you went to your wife's house to-day, whom did you expect to shoot? A. The wife first.

"Q. And then who? A. The father.

"Q. The father? A. That's right.

"Q. The sister, too? A. Well, that married sister wasn't there.

"Q. If she were there, would you have shot her, too? A. That's right.

"Q. Was it your intention to kill them all? A. Well, mostly them two, because they been always—They always got up them lies. They are always, you know, getting me messed up.

"Q. How about the sister Agnes? A. Well, she is snotty before when I used to go down there. None of them liked me. I felt the same way towards them.

"Q. So that you didn't like them and they didn't like you; is that it? A. That's right.

"Q. And because of that feeling between you people you decided to kill them; is that right? A. Yes, for lying."

When defendant arrived at his father-in-law's house his wife and her sister were in the kitchen. Rozanski himself was in a bedroom, sleeping. The defendant knocked at the kitchen door and was admitted. He took the rifle package from under his coat and put it behind a chair. There was some trivial conversation. The defendant's testimony on the witness stand was that he asked his wife about some phonograph records that her brother had borrowed. His testimony follows:

"Then I asked the wife about the records, did she ask the brother for it. She said, 'He was just here. Why didn't you ask him?' That is all. I guess, and then I started shooting. And when I did, she was spilling hot water in the sink from the kettle.

"Q. And when you started shooting you were in which room, Daniel? A. The living room, the parlor.

"Q. And where was your wife? A. She was alongside of the sink in the kitchen, spilling hot water from the kettle in a pan or something. I don't know.

"Q. Which firearm did you use then? A. The short one, the thirty-eight.

"Q. Did you know how many times you fired it then? A. I think it was once. Then she started hollering and backed into the closet.

"Q. Yes. A. Hollering for her pop, or what.

"Q. Then what happened, Daniel? A. I think he said 'What is the matter' once or twice. I don't know just what he said, but I think I heard it once. He went right to the closet door. And then I was still in the parlor. It was on a slant. And I let one go, and he was still standing up.

"Q. Speak louder. A. Well, he came alongside of the sink there, facing the pantry door, and I let one go from the thirty-eight, and he was still standing up, so I gave him another one. Then he fell."

The fact that defendant's wife got into the closet or pantry saved her life; but Molnar, after killing the father, tried unsuccessfully to open the pantry door, fired a rifle shot or two through the door, heard no sounds from his wife and decided that she was dead. Rozanski had made no motions with respect to, and so far as appears said nothing to, the defendant. He had come into the kitchen and was facing the pantry door, behind which his daughter was taking cover, and was asking the cause of the disturbance when he was struck down by two bullets deliberately fired at him by the defendant from an adjoining room. The defendant continued his deadly fire, either from within the house or outdoors, until he had shot and seriously wounded two police officers, shot and killed a colored girl and shot and killed the deputy chief of police of the municipality. The later shootings were done with the rifle. The defendant twice refilled the clip from the supply of extra cartridges that he had brought with him. The indictment upon which the defendant was tried was for the murder of Adam Rozanski.

It is first said on behalf of the defendant that the verdict was against the weight of the evidence, and interwoven with the argument thereon is a suggestion of mental irregularity rested largely upon a copy of a routine report form, made by the examining board at Newark for army induction purposes and forwarded to and produced from the files of the local draft board in Carteret, stating that Molnar was unfit for military service by reason of a psychoneurosis. The negligible evidential value of such a report, without a showing of specific irregularity and without supporting oral testimony, is still further discounted by the statement in the same report that the examination was negative as to mental condition and that the subject met the intelligence standards on the tests administered. Our cases are clear that sanity is presumed, that the defense of insanity is an affirmative one which must be established by the accused by a preponderance of proof and that the extent and character of insanity which constitutes a defense against a criminal charge must be such as to render the accused incapable of distinguishing between right and wrong at the time of and with respect to the act committed. *State* v. *Maioni,* 78 *N. J. L.* 339; *State* v. *Lynch,* 130 *Id.* 253. There was no proof of insanity in that sense. Mental experts examined the defendant in advance of trial at the instance of and in company with his attorneys but did not testify. A motive for the murder was established against defendant out of his own mouth; likewise willfulness, deliberation and premeditation.

To justify the setting aside of the verdict of a jury on the ground that it is against the weight of the evidence the verdict must so clearly appear to be against the weight of the evidence as to give rise to the inference that it is the result of mistake, passion, prejudice or partiality on the part of the jury. *State* v. *Dworecki,* 124 *N. J. L.* 219. The verdict of guilt conforms to and is not against the weight of the evidence.

The defendant presents as his second point that the court erred in refusing to charge the following request in its entirety:

*"The evidence that has been offered and accepted in this*

case on behalf of the state and the defendant is for the purpose
of proving the guilt or innocence of the defendant in accord-
ance with the rules of law which I have heretofore given you.
*The same evidence, however, as offered by either the state or
the defendant may be used and considered by you not only for
the purpose of determining the guilt or innocence of the
defendant, but, in case of first degree conviction, the punish-
ment to be inflicted upon this defendant.* You have been
instructed as to the requirements for legal insanity in New
Jersey. If you should find that this defendant was legally
sane on December 7th, 1944, but you should also from this
same evidence find that he suffered from some mental irregu-
larity or abnormality short of legal insanity, you are justified
in giving this due consideration in determining the punish-
ment to be inflicted.

"In other words, if you find that the evidence falls short
of establishing insanity as defined by New Jersey law, you
are not obliged to disregard or discard said evidence for all
purposes and you are entitled to consider said evidence, in
case of a first degree conviction, in selecting the punishment
under the authority vested in you as previously explained."

The court charged so much of the request as is printed in
italics and declined to charge the remainder. It had already
told the jury of its authority under the statute; a part of
the charge, incorporating the statutory language, being as
follows:

"If you find the defendant guilty of murder of the first
degree you may recommend imprisonment at hard labor for
life. The law in that connection is as follows: Every person
convicted of murder in the first degree, his aiders, abettors,
counsellors, procurers, shall suffer death, unless the jury
shall, by their verdict and as a part thereof, upon and after
consideration of all the evidence, recommend imprisonment
at hard labor for life, in which case this and no greater punish-
ment shall be imposed.

"So that if you come to the conclusion that the defendant
is guilty of murder in the first degree, then your verdict will
be murder in the first degree. And if you intend that he
should not be executed, then you must say, 'Murder in the

first degree with recommendation of imprisonment at hard labor for life.' Unless you do that, it would be the duty of the court to disregard any recommendation."

To have charged specially with respect to the varying phases and effects of insanity upon punishment as contrasted with guilt would have been confusing and would have tended to produce misapprehension. The defendant was not entitled to have any particular element of evidence emphasized. The statutory direction is that before the jury may recommend a reduction of the death penalty to imprisonment it shall consider all of the evidence, *State* v. *Jefferson,* 131 *N. J. L.* 70, and the jury was so informed. The subject-matter was adequately charged. The matter refused was properly refused.

To aid in retaining a correct perspective of that jury function we shortly review the history of the legislation. The statute up to and for many years preceding the year 1916 provided as follows: "Every person convicted of murder in the first degree * * * shall suffer death." *Pamph. L.* 1898, *ch.* 235, § 108; *Pamph. L.* 1796, *ch. DC, p.* 92, § 3. By chapter 270, *Pamph. L.* 1916, the statute was amended to read: "Every person convicted of murder in the first degree * * * shall suffer death unless the jury at the time of rendering the verdict in such case shall recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed." On March 3d, 1919, this court handed down its decision in *State* v. *Martin,* 92 *N. J. L.* 436, by which it reversed the judgment of conviction and construed the foregoing amendment to mean that such a recommendation was not a part of the verdict and that a jury in determining whether to make or to refuse a recommendation was not bound to consider the matters which evidenced the guilt of the accused. The court was divided eight to six, and inasmuch as the legislature clearly was opposed to the state of the law as pronounced by the majority it may be informing to quote briefly from the two minority opinions:

By Judge White:

"I understand it is a matter of common knowledge that prior to the act of 1916 many first degree murderers escaped punishment because of a reluctance on the part of juries to

find verdicts requiring the death penalty, and that an effort was made to remedy this condition by attempting to enact legislation abolishing capital punishment, but the attempt failed, and instead, that the legislature enacted the act of 1916 authorizing a verdict of first degree murder with a recommendation of life imprisonment, and providing that the punishment in case of a verdict without such a recommendation should be death, but with such a recommendation it should be life imprisonment. As a result of this act it was thought that juries which would not find verdicts involving the death penalty, would find verdicts involving imprisonment for life."

By Chancellor Walker:

"I agree that the jury should be instructed that they have an absolute discretion in the matter of making or withholding the recommendation, provided, however, they are told that their determination to do the one or the other is confined to and arises out of a consideration of the evidence"

The legislature, obviously stirred by the court holding, forthwith, on April 12th, 1919 (chapter 134, *Pamph. L.* 1919), amended the statute to read (italics inserted) : "Every person convicted of murder in the first degree \* \* \* shall suffer death unless the jury shall *by their verdict, and as a part thereof, upon and after consideration of all the evidence* recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed." (The present wording is essentially the same. *R. S.* 2:138–4.) It is of interest to note that the legislative emendation of the statute followed the reasoning of the dissenting opinions and that those opinions ran, not to the advantage of the appellant, but to an affirmance of the judgment of conviction. To the extent that the opinion of Judge White reflected the legislative thought regarding the purpose and proper effect of the statute, the object of the legislation was not primarily to benefit a person undergoing trial for murder but, on the contrary, was to so accommodate the law to the psychology of jurors that convictions of first degree murder might be reached when deserved; and it would quite thwart such an objective if that remedial statute should become only another bothersome technicality to entangle the conviction of a malefactor.

The character of the sentence is not an issue for trial. The issue is guilt or innocence and, as always, only proof relevant to that issue is admissible. The statutory punishment for first degree murder is death, subject only to the condition that the jury in its absolute discretion chooses to recommend imprisonment at hard labor for life; a recommendation that shall not be made, however, except after consideration of all of the evidence and by incorporating the recommendation in the verdict of guilt. If that condition does not arise, the penalty is death, determined not by the jury, but by the statute, and pronounced by the court. It is not correct to say that the jury imposes the sentence of death where it does not choose to make the recommendation for life imprisonment; just as it would not be correct to say that the Court of Pardons imposes a death penalty merely because it does not grant a pardon or commutation.

A further allegation of error is that the court declined to charge all of a request that fills two printed pages and need not be reproduced here. The portion of the request omitted from the charge bears upon the penalty for second degree murder. We find no error in the refusal. It is enough to say that the defendant could not have been prejudiced for the reason that the jury, with ample support in the proofs, found a first degree verdict and was, in any event, not concerned with the penalty for second degree murder.

Finally, it is said that the trial court committed prejudicial error in undertaking to answer, and in making the answer that it did make, to a question from the jury about the finality of a recommendation of life imprisonment. Both question and answer are incorporated in the court's remarks:

"The court: Ladies and gentlemen of the jury, you have sent me this note: 'We the jury want to know if we arrive at a verdict of guilty in the first degree with a recommendation for life imprisonment at hard labor, whether he shall remain in prison for the rest of his natural life, or would he have a chance for parol.' Signed by your foreman.

"If you shall by your verdict impose life imprisonment, it can be disregarded and set at naught by the Court of Pardons in accordance with the provisions of the statute to the effect

that every convicted person confined in state's prison for the term of his natural life whose record of conduct shows that he has observed the rules of the institution, and who has served not less than fifteen years, may be released on parole."

・ Various criticisms are expressed; . chiefly that the information desired was none of the jury's concern, that knowledge of the existence of the Court of Pardons should be kept away from a jury, that if the jury is to be told anything it should be told everything, about the nature and extent of the parole and pardoning power, and that the court's statement about the necessity for a fifteen year imprisonment as a preliminary for parole has no legal justification.

It is true that the law no longer requires a minimum confinement of a life prisoner for fifteen years before he may be released on parole. The instruction was apparently lifted by the court from the decision in *State* v. *Carrigan*. 93 *N. J. L.* 268; *affirmed,* 94 *Id.* 566, rendered at a time when the pertinent provisions of chapter 214, *Pamph. L.* 1914, were effective. The fifteen year provision was repealed by chapter 50, *Pamph. L.* 1922. See *Lindsley* v. *Board of Managers, &c., State Prison,* 107 *Id.* 51; *affirmed,* 108 *Id.* 415. But clearly the defendant was not prejudiced by that mistaken reference. If the jury was influenced adversely to a recommendation by the belief that a life sentence could be terminated after only fifteen years of confinement, surely that adverse sentiment would not have been removed by the knowledge that no period of preliminary confinement was essential to a parole. *State* v. *Mosley,* 102 *Id* 94, 106.

We discover no sound reason why a jury, debating upon whether it should reduce the penalty of death to the statutory "imprisonment at hard labor for life," should not ask and be told whether such a recommendation will be effective according to its terms or be subject to modification by some other authority.

The court has repeatedly held that it is not error to inform a jury regarding the existence of the power of the Court of Pardons; thus before the 1919 amendment, *State* v. *Rombolo,* 89 *N. J. L.* 565, and after that amendment, *State* v. *Schilling,* 95 *Id.* 145, 154; *State* v. *Mosley, supra; State* v. *Leaks,*

126 *Id.* 115. Had the jury asked about the full authority of the Court of Pardons or placed its inquiry in such form as to call for plenary information, doubtless a more comprehensive response would have been given. As it was, they asked a specific question which they were entitled to have answered, and the question was answered fully and in all material respects accurately. We find no prejudicial error in the instruction.

The judgment below will be affirmed.

HEHER, J. (Dissenting.) I entertain the view that the refusal to charge the entire content of the accused's request specifically affirming the propriety of considering the evidence bearing upon his mental condition at the time of the homicide, in the performance of the jury's function of determining the penalty upon a finding of murder in the first degree, constituted prejudicial error. In a word, the trial judge refused a direction that, if the jury found that, at the time of the killing, the prisoner "suffered from some mental irregularity or abnormality short of legal insanity," they would be "justified in giving this due consideration in determining the punishment."

Under the statute, every person convicted of murder in the first degree shall suffer death, unless the jury shall by their verdict, and as a part thereof, "upon and after consideration of all the evidence," fix the punishment at life imprisonment. *R. S.* 2:138-4. Upon this inquiry, the jury are not limited to a consideration of some specific phase of the evidence, or under a duty to put aside evidence that is inadequate to sustain the particular defense to which it is directed; they are obliged to consider *all* the evidence introduced at the trial.

I am unable to concur in the theory that the design of the amendment of 1919 was, without more, "to so accommodate the law to the psychology of the jurors that convictions of first degree murder might be reached when deserved." I do not believe it was within legislative contemplation that the jury should exercise the granted power arbitrarily, but rather to prescribe life imprisonment as the punishment where there are in the particular circumstances elements which, in their

sound discretion, call for a mitigation of the full rigor of the law. Is not this implicit in the amendment confining the jury to the evidence in the cause in the fixation of the punishment? If the purpose merely was the inducement of a verdict of first-degree murder where the particular jury, or one or more of its members, would be otherwise deterred therefrom by objection to the death penalty, why was the amendment deemed necessary at all? It was pointed out by Judge White in his dissenting opinion in *State* v. *Martin,* 92 *N. J. L.* 436, that the original act of 1916 followed futile efforts to abolish capital punishment; and it is not to be presumed that the legislature intended, by the amendment, to leave that still to the mere whim or caprice of the jury in the individual case. Rather, I think the amendment was written in the light of Chancellor Walker's dissenting view that in the exercise of this function under the original act, the jury "should be guided by the evidence, and, where mitigating circumstances appear in the evidence, the recommendation to imprisonment for life may, with propriety, be made, but where the murder is without palliation or mitigation that the recommendation should be withheld." I am clear, however, that considerations apart from mitigating or extenuating circumstances in the crime itself may serve thus to qualify the verdict if they arise out of the evidence, or lack of evidence, as revealed on the trial of the cause. Mental deficiency or illness might well justify that course, in the exercise of a sound discretion, even though the prisoner was capable of distinguishing between right and wrong; and this would be within the intendment of the statute. The statutory discretion is to be exercised upon a view of the evidence as a whole. The issue is committed to the judgment and consciences of the jury; and the inquiry is whether, under all the circumstances disclosed by the evidence, it would serve the interests of justice, as between society and the accused, if capital punishment were not imposed. Compare *Winston* v. *United States,* 172 *U. S.* 309; 19 *Sup. Ct.* 212; 43 *L. Ed.* 456. Conscientious scruples against the imposition of the death penalty, or matters dehors the evidence, have no place in the discharge of this function. Plainly, such were not within the legislative view.

The instruction given here was merely in the general language of the statute; and I conceive it to have been the prisoner's right, if he chose to exercise it, as indeed he did, to have a specific adaptation of the statutory principle to the particular circumstance. The rejected request was directed not to the placing of emphasis upon a special fact or circumstance, but the elucidation of the ruling principle. In resolving whether the death penalty should be exacted, could the jury consider evidence establishing mental abnormality falling short of legal insanity? Confusion and misapprehension as to the quality and scope of the principle is only too likely when the statutory meaning is conveyed by terms which are vague and uncertain; and specification is the antidote. The sphere of the jury's power in a matter of such gravity should be so explicitly delineated that there can be no occasion or opportunity for misunderstanding. Such is the absolute right of the accused. Is it more important to instruct the jury as to the constitutional power of the Court of Pardons to terminate life sentences than to clarify doubts as to the power of the jury itself in the resolution of a question of such moment? I think not.

Mr. Chief Justice Brogan and Mr. Justice Colie join in this opinion.

*For affirmance*—THE CHANCELLOR, PARKER, CASE, BODINE, DONGES, PERSKIE, RAFFERTY, DILL, FREUND, JJ. 9.

*For reversal*—THE CHIEF JUSTICE, HEHER, COLIE, WELLS, JJ. 4.