STATE OF NEW JERSEY, RESPONDENT, v. RALPH
CORDASCO, DEFENDANT-APPELLANT.

Argued March 28, 1949—Decided May 9, 1949.

190

*Mr. Edward R. McGlynn (Mr. Joseph Weintraub,* on the brief) argued the cause for the appellant.

*Mr. Duane E. Minard, Jr. (Mr. C. William Caruso,* on the brief) argued the cause for the State.

The opinion of the court was delivered by

WACHENFELD, J. This is an appeal from a first-degree murder conviction returned without a recommendation for life imprisonment as allowed by statute, resulting in the death penalty.

The appellant, Ralph Cordasco, shot and killed his estranged wife, firing five bullets into her body at a close range, estimated by a ballistics expert to be within a few inches. The main facts are amply proved and corroborated and indeed are not denied by the appellant, who admits firing the shots.

The tragedy occurred on Decmber 19, 1947, on North Seventh Street, Newark. Appellant and his wife were married in March, 1947, and shortly thereafter experienced marital difficulties causing a separation on September 12, 1947. About November 4th, the husband bought a gun, claiming it was for self-protection, while the State argues the purchase was made in preparation for the killing which ultimately resulted. It was acquired under an assumed name in Burlington, Vermont, where the husband journeyed to purchase Christmas trees for resale. He says threats had been made against him and he cut off the barrel of the gun so that he could carry it conveniently for protective purposes.

The husband was fifty years of age and the deceased wife thirty-seven. Originally there was opposition to the marriage by the mother of the wife, who later rather emphatically

expressed her objections, while the father was more kindly disposed and even encouraged the appellant's attempts at reconciliation after the breach had occurred. In addition to her opposition, the appellant says his mother-in-law at times made threats of physical violence against him.

The shooting occurred in broad daylight shortly after noon. According to the husband's version as to the sequence of events, he caught up with his wife when he saw her on the street, called her by name and walked alongside her. Seeking a reconciliation, he smiled affably and said, "Let's be more charitable toward each other for Christmas." When he spoke these words, she struck him across the mouth with her purse. He experienced a pain in the head and did not know what happened after the blow was struck until his next conscious moment about five-thirty that afternoon when he found he was wandering in the neighboring City of Orange. After buying a newspaper, he read an account of the killing and surrendered to the authorities early the next morning.

In a voluntary statement made to the police after he was taken into custody, he said:

"With my saying of the Christmas Spirit, she swung her purse and hit me in the mouth. Then I pulled the gun out of my pocket in my right hand and when she saw the gun she said 'Ralph.' That's all I can remember she said. I am pretty sure I did not say a word. I don't remember if I had shot her once or twice before she said, 'Ralph' and I don't know how many times I fired the gun. I was about two feet from her when I was pulling the trigger on the gun."

At the trial, however, on cross-examination, after first denying he fired the shots that killed his wife, he testified as follows:

"Q. Do you know who did? A. I held the revolver.
"Q. Who shot it? A. I did.
"Q. She was killed, wasn't she? A. I didn't kill her.
"Q. You didn't kill her? A. No.
"Q. Who did? A. I shot her.
"Q. You shot her? A. Yes.
"Q. How many times did you shoot her? A. I don't remember.
"Q. You don't remember? A. No, not at that time. I do know now.
"Q. How many times did you shoot her? A. Four or five."

The autopsical report revealed five bullet wounds, three of which entered the back and passed completely through the body. Another entered the right abdomen, passing through the body over the hip on the left side, and the fifth entered the mouth, coming out at the jaw. The medical testimony indicated that any of the wounds, with the exception of the one in the mouth, might have been fatal.

A number of witnesses produced on behalf of the State were near the scene of the shooting at the time and heard the shots and saw most of what took place. A written statement in narrative form, signed and executed by the appellant a few days after the shooting, and a subsequent transcript of questions and answers were admitted in evidence. There was testimony that, during the period of separation, the accused had been summoned to the Police Court on charges made by his wife of assault and battery and threats of violence, and there was evidence of the disposition of these charges as well as the conversation of the police magistrate with the appellant warning him to refrain from further annoyance of his wife. There was also proof of other threats made by the husband against his wife prior to the fatal shooting alleged in the indictment.

The questions presented for our consideration relate to the striking and excluding of certain testimony as to the mental condition of the defendant, error in the charge of the court with respect to insanity as a defense and in mitigation of the offense and its relation to provocation and its bearing upon a recommendation for life imprisonment, error in the charge with respect to the mental operations raising murder from second degree to first degree, the query as to whether or not the homicide was committed by lying in wait, the failure to charge, in effect, that the jury could not arrive at a verdict until it was unanimous on the recommendation of life imprisonment, error in charging that an acquittal was not sought but a concession of manslaughter was made, error with respect to the charge on provocation, and finally that the verdict was against the weight of the evidence.

The points raised will be dealt with in the order of their presentation.

When Dr. Sobin testified as to his observation of the mental condition of the accused in 1931, objection was made because of remoteness. The testimony was allowed, however, pending proof of continuance thereof to the time of the murder and Dr. Robie was produced to accomplish this end. He first saw Cordasco on December 24, 1930, at the mental hygiene clinic of the Overbrook Hospital. When he was asked the case history, another objection was made which brought about a colloquy between court and counsel. It was then contended the testimony was admissible as bearing upon the ability of the appellant to premeditate and deliberate.

The court, pursuing this theory, inquired of the doctor about his findings from his examination as to whether the appellant was capable of premeditation and deliberation on the 19th of December, 1947, the date of the crime. The answer was direct and positive admitting the accused was capable of both mental operations and, when the witness was asked his conclusion as to whether or not Cordasco was in a mental condition to know the nature and quality of his acts and whether they were right or wrong, he replied:

"That requires two answers, I believe, and the answer to the first part is I did come to a conclusion; to the second part my answer is that my conclusion was that he was able to distinguish between right and wrong. * * * And he knew the nature and quality of his acts."

The court then ordered the previous testimony stricken, which is the basis of the alleged error.

■ If our rule on insanity is to remain, the mere recital of the question indicates the obvious answer. If the defendant knew the nature and quality of his act and was conscious that it was wrong and had the ability to deliberate and premeditate, the testimony offered did not constitute a defense, was immaterial and was therefore properly stricken.

Underlying and interwoven in the reasoning advanced by the appellant, there is the contention that the rule of insanity

as presently enforced is not equitable, fair or just and should be so changed as to permit the jury, where there is any form of insanity or maladjustment even though it does not come without our rule, to give it consideration in mitigation of or to reduce the degree of murder or as an aid in deciding whether a recommendation of life imprisonment should be attached to the jury's verdict as permitted by our statutory enactment.

Our rule on insanity is otherwise and stems from the *McNaghton Case,* 10 *Clark & Finnelly* 200. In *State v. Spencer,* 21 *N. J. L.* 196, it was said:

"The simple question for you to decide is whether the accused at the time of doing the act was conscious that it was an act which he ought not to do. If he was conscious of this, he cannot be excused on the score of insanity. He is then amenable to the law."

This rule has been cited, reaffirmed and followed many times. *State v. Maioni,* 78. *N. J. L.* 339 (*E. & A.* 1909); *State v. Kudzinowski,* 106 *N. J. L.* 155 (*E. & A.* 1929); *State v. Close,* 106 *N. J. L.* 321 (*E. & A.* 1929); *State v. George,* 108 *N. J. L.* 508 (*E. & A.* 1931); *State v. Fine,* 110 *N. J. L.* 67 (*E. & A.* 1932).

In *State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945), the law was re-stated as follows:

"Our cases are clear that sanity is presumed, that the defense of insanity is an affirmative one which must be established by the accused by a preponderance of proof and that the extent and character of insanity which constitutes a defense against a criminal charge must be such as to render the accused incapable of distinguishing between right and wrong at the time of and with respect to the act committed."

Insanity varying from this legal concept will not suffice as a defense and one who kills because of an irresistible impulse cannot seek an acquittal on that basis. *Genz v. State,* 59 *N. J. L.* 488 (*E. & A.* 1896); *Mackin v. State,* 59 *N. J. L.* 495 (*E. & A.* 1896); *State v. Carrigan,* 93 *N. J. L.* 268 (*Sup. Ct.* 1919); *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926); *State v. George, supra.*

█ Likewise "emotional insanity," being the result of some defective or perverted moral sense, will not bar a conviction. *State v. Aeschbach*, 107 *N. J. L.* 433 (*E. & A.* 1930). Nor will low mentality constitute legal insanity. *State v. Schilling*, 95 *N. J. L.* 145 (*E. & A.* 1920); *State v. George, supra.*

The law of insanity in this State is clearly defined, deeply imbedded and consistently followed. Conceding this, the appellant contends that our adherence to precedent denies reality and continues an anachronistic concept of insanity which fails to keep pace with the newly acquired medical knowledge and psychiatric progress made by those who are to be lauded for their devotion to the suffering and mental afflictions of others under a multitude of varying circumstances.

An answer to the thought so expressed was given twenty-three years ago by the then court of last resort in *State v. Noel, supra.* The similarity of the plea and the reasons is striking. There the question was squarely raised as the State conceded the existence of insanity, admitting the defendant had been institutionalized in a mental hospital prior to the commission of the crime, the prosecution being upon the theory that, although insane, the defendant nevertheless could distinguish right from wrong. The court, citing the reasons submitted, said:

"The argument advanced to dethrone the test of insanity when offered as an excuse for crime adopted eighty years ago in this state is that during these years the science of medicine has advanced and those devoting themselves to the study of mental diseases have increased in wisdom and learning to the point that they have demonstrated that the test to which our courts have so long adhered is obsolete and for it should be substituted either the rule of irresistible impulse, or that of permitting the jury to pass upon the question as to whether the defendant is affected mentally, and if so, either to acquit him or reduce the grade of the crime to murder of the second degree."

In denying the application, which was vigorously pressed, this answer was given:

"We here reaffirm the test of sanity in a criminal case as laid down in the Spencer case. We do not do so because of its antiquity.

We do so because we believe that it is the best test which has as yet been promulgated. It may not be scientifically perfect in the opinion of those most learned on the subject of mental disorders, but it has during all these years proved to be workable and a safeguard for the security of life and property. There are many rules of law which are not perhaps logical. They can, from the standpoint of logic, be successfully attacked; yet, many of these laws have remained unaltered by statute or decision because they have stood the test of practical trial. Our courts are not schools of logic. They administer the law and the law should not be changed because a case arises in which its application to the facts appears to result oppressively."

Our serious study and re-evaluation lead us to a like conclusion and for primarily the same reasons. The rule condemned by many as ancient nevertheless seems to give as great a measure of protection and security to society as the exigencies and complexities of present-day circumstances will permit.

We concur in the rule as presently inscribed in our cases, not because we are restricted by precedent but by reason of our consciousness of the depth of a most difficult problem and the possible serious consequences flowing therefrom. The standard which appellant urges for acceptance in place of that heretofore uniformly followed has not been sufficiently defined for practical application and might open the door to the evasion of criminal responsibility so as to transcend and threaten the public interest which our laws seek to protect.

In charging the jury generally on insanity, the court, amongst other things, said that the law regards insanity as a disease of the mind implying fixedness and continuance of mental incapacity and that the test was not whether he was actually at the time in the mental state of appreciating the nature and quality of his act and of knowing that it was wrong but whether he had the capacity to do so. It is maintained that these portions of the charge were erroneous because they reject temporary insanity and improperly prescribe capacity as the true test.

Identical language was used with approval in *Graves v. State*, 45 *N. J. L.* 347 (*E. & A.* 1883). This portion of the charge in the case *sub judice* was a general resume of the

law on insanity, its purpose being to inform the jury that insanity went only to the question of the guilt or innocence of the accused and could not operate to reduce the degree of murder nor be used in mitigation.

The defense of temporary insanity was not an issue here. It had been ruled out as there was no testimony upon which it could be bottomed. The court, mindful of this fact, said:

"You have heard discussion here about insanity, and it leads me to present to you the aspects of the law of insanity to such extent as may seem necessary, as that law exists here in our State of New Jersey."

The situation here developed is not comparable to *State v. Lynch,* 130 *N. J. L.* 253 (*E. & A.* 1943). The reversal there was not caused by the charge as given but by the refusal to charge as requested on temporary insanity. Here there was no such defense and no request to charge in reference to it. *State v. Capawanna,* 118 *N. J. L.* 429 (*Sup. Ct.* 1937). Furthermore, a request to charge to the effect that if the defendant was rendered incapable of forming an intent by any cause, he would be entitled to an acquittal, was submitted by the appellant and charged *in toto* in the language requested and the court in its main charge said:

"If defendant's mental faculties were so prostrated by deceased's blow or by a pain in the head, or by any other cause whatever, so that he was rendered incapable of forming an intent to fire the shot or shots which it is alleged were fired, then there was no willful act or any malice and he would be entitled to an acquittal."

Under these circumstances we discern no error.

It is next said that the trial court erred in its charge with respect to the mental operations described in the statute in reference to the degree of murder. It is argued there was error in the court's failing to charge that the intention to kill, the deliberation and premeditation necessary to constitute murder in the first degree, are not synchronous mental operations but are separate and distinct, one following the other, and that some appreciable time must elapse between

the conception of the intent to kill and the execution of the intent.

On this point the court charged:

"By deliberate and premeditated the law does not mean any particular length of time need intervene between the formation of the purpose to kill and its execution. Time sufficient to fully and clearly conceive the design to kill and purposely and deliberately execute it satisfies our statute."

This has been the law as set forth in *Donnelly v. State,* 26 *N. J. L.* 463 (*Sup. Ct.* 1857); affirmed, 26 *N. J. L.* 601 (*E. & A.* 1857); *State v. Bonofiglio,* 67 *N. J. L.* 239 (*E. & A.* 1901); *State v. Close, supra.*

The three ingredients of first-degree murder were explicitly covered in the charge as made and it was not necessary that the deliberation and premeditation should continue for a specified time. It is sufficient if the design to kill was fully conceived and purposely executed. *State v. Donnelly, supra.* No violence was done to the established rule by the phraseology here employed, which accurately conveyed to the jury the necessary factual conclusions they were compelled to arrive at before bringing in a verdict of first-degree murder.

The third point is that the court erred in leaving to the jury the question whether the homicide was committed by lying in wait. It is not seriously pursued and is apparently without merit. The court correctly defined the prerequisites of murder in the first degree, willfulness, deliberation and premeditation, and the part of the charge objected to was a recitation verbatim from the statute applicable to this situation, *R. S.* 2:138–2, which also covers murder by poison or by lying in wait.

The reference to the statute was simply to clarify the issue for the jury by citing the legislative enactments on the subject of the murder indictment presently on trial. It pointed out the statutory distinction between first- and second-degree murder. There is little merit to the theory advanced that the issue of lying in wait was erroneously submitted to the jury when consideration is given to the court's charge of the

defendant's request that "the State must prove beyond a reasonable doubt that the killing in this case was willful, deliberate and premeditated to justify a verdict of first-degree murder. If any one of these essential elements is missing, you cannot convict the defendant of first-degree murder."

It is next submitted there was error in failing to charge the jury that until it reached unanimity on a recommendation of life imprisonment, it could not arrive at a verdict of guilty. There is no criticism of what was said by the court but of its failure to charge that the decision on the recommendation had to be reached by a unanimous vote before a verdict of guilty could be returned. A number of references were made to this phase of the case in the court's charge. Firstly it said:

"In regard to any recommendation, I have nothing whatever to say. Indeed, I haven't the slightest right to comment upon that. That is your responsibility solely."

And again the court said:

"In case your verdict should be murder in the first degree, you will also please remember that the law now provides that every person convicted of murder in the first degree shall suffer death unless the jury shall, in their discretion and by their verdict and as part thereof, upon and after a consideration of all the evidence, recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed."

The court correctly charged the jury as to the provisions of the statute, R. S. 2:138-4, using almost its express phraseology.

In *State v. Molnar, supra,* the court said:

"The character of the sentence is not an issue for trial. The issue is guilt or innocence and, as always, only proof relevant to that issue is admissible. The statutory punishment for first degree murder is death, subject only to the condition that the jury in its absolute discretion chooses to recommend imprisonment at hard labor for life; a recommendation that shall not be made, however, except after consideration of all of the evidence and by incorporating the recommendation in the verdict of guilt. If that condition does not arise, the

penalty is death, determined not by the jury, but by the statute, and pronounced by the court. It is not correct to say that the jury imposes the sentence of death where it does not choose to make the recommendation for life imprisonment; just as it would not be correct to say that the Court of Pardons imposes a death penalty merely because it does not grant a pardon or commutation."

It is fundamental and of common knowledge that verdicts in criminal cases must be determined by unanimous vote. When the verdict was returned, counsel requested the jury be polled and the clerk, by direction of the court, called each individual juror by name and inquired of his determination and each and every juror affirmed the verdict as rendered by the foreman.

The court followed the requirements of the statute in its charge and in plain, unambiguous language informed the jury if they found the defendant guilty of first-degree murder, they had the right to make a recommendation of life imprisonment. There was no request to charge on the theory presently advanced, State v. Capawanna, supra, and we therefore find no error in this regard.

The fifth point likewise carries with it little conviction. It is urged that error was committed in charging that the appellant did not seek an absolute acquittal but conceded guilt of manslaughter. In opening to the jury, counsel said:

"We most respectfully say that the most that Ralph Cordasco was guilty of was manslaughter."

And again in his closing statement counsel said:

"* * * I feel confident that your verdict will not be murder in the first degree or even murder in the second degree, but that you will agree with our contention that as a result of this unfortunate happening no finding beyond manslaughter should be returned."

There can be little doubt.as to the position taken by the appellant and the argument presently advanced lacks reality and has no basis in fact. Even if it were substantiated by the record, the court, at the time that he made reference to this phase of the case, said:

"Although, as I understand his counsel—but if I am wrong they will correct me—they did not ask that the defendant be acquitted altogether. As I understood their request to the jury, it was that the defendant be convicted of no greater crime than manslaughter."

This was an open invitation to counsel for the appellant to have the record altered in the event it was not factually accurate, which invitation was not accepted as the record shows no objection or criticism of the court's charge as made.

The sixth point urged is that the trial court erred in leaving to the jury the question whether the blow delivered by the deceased wife constituted provocation, contending that the ruling was a question of law rather than a question of fact.

Where disputed or doubtful, provocation is a question of fact for the jury, under instructions from the court, to determine whether it existed in the particular case and whether in fact it did excite the accused's passion sufficiently to reduce the degree of homicide.

The state of facts relating to provocation was here rendered doubtful by the accused's own conflicting statements and properly became a matter to be decided by a jury. He stated on direct examination that after his wife struck him across the mouth with her purse and before the shooting, his mind became blank and remained so for four or five hours or more, while in the voluntary statements to the police and on cross-examination he described in detail the shooting and his actions immediately following. The assertions of mental oblivion made on the stand were at variance with his statement detailing what he did and where he went during the period of alleged lapse. In view of these conflicting statements, it cannot seriously be contended that the trial court should have charged the jury on the question of provocation as a matter of law.

The court disposed of the issue by charging:

"As to whether there was provocation and whether it was a reasonable one, whether the defendant acted in such a sudden transport of passion or heat of blood as not to be master of his own understanding, whether sufficient time elapsed between any alleged provocation and the act of killing as to be reasonably sufficient for reason to

resume its sway, are all questions for the jury, and for the jury alone."

We think the court was compelled to submit this conflicting evidence to the jury and find no error in the charge in this respect.

The appellant's final contention is that the verdict was against the weight of the evidence as to the degree of murder. A verdict will not be set aside as against the weight of the evidence except where it is clearly the result of mistake, passion, prejudice or partiality. *State v. Boccadoro,* 105 *N. J. L.* 352 (*E. & A.* 1928); *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935); *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1947).

 There was ample evidence to support the verdict of the jury. The *corpus delicti* was admitted. The appellant testified to purchasing the gun under an assumed name, sawing off the barrel so that he could carry it easily, accosting his wife on the street and firing the shots that killed her. Several witnesses were produced who were near the scene and saw most of what took place. They testified as to the appellant's presence and his close proximity to his wife. They saw him hold the gun, heard the shots and the screams of the deceased and saw her fall at his feet before he fled from the scene of the crime.

Appellant's assertion that his mind was a blank and that he could not remember the shooting is contrary to his testimony on cross-examination, where he admitted firing the shots, and to his voluntary statement made to the police, in which he gave a detailed description of most of the tragedy.

It was the function of the jury to determine which of the appellant's conflicting statements was worthy of credence, and the verdict reached was supported by an abundance of corroborative proof.

After a thorough examination and consideration of the entire record, we are firmly convinced that there was ample evidence and sufficient proof to support the verdict of first-degree murder returned by the jury.

The judgment is affirmed.

Heher, J. (Dissenting.) The judge admitted evidence that in 1931, at the age of 34, the accused was afflicted with dementia praecox, and in 1942 was found to be a "psychopathic personality" with a "paranoid twist," and that a psychiatric examination in April, 1948, "confirmed the previous findings" made in 1931, and then struck it all out when one of the neuropsychiatrists expressed the opinion that, on the *day* of the homicide, the accused was "able to distinguish between right and wrong" and "knew the nature and quality of his acts" and was "able" to "deliberate" and "premeditate." On the same hypothesis, the judge excluded all evidence tending to show a history of abnormal behavior and mental instability and insanity.

And, in apparent keeping with this conception, the judge charged:

"The defense of insanity goes only to the question of guilt or innocence of the accused, as I have already indicated. It cannot operate to reduce the degree of guilt. The insanity of the defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree or to manslaughter. If he is responsible at all in this respect he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal. The doctrine that a criminal act may be excused or mitigated on the ground of insanity, where the defendant has the mental capacity to appreciate his legal and moral duty with respect to it, has no place in the law of this state. However, as I understand it, the defendant does not claim that he was insane legally. Dr. Robie, his expert, testifies that he was legally sane, that he knew the nature and quality of his act and that it was wrong. He further testifies that he had the capacity to deliberate and the capacity to premeditate."

In view of the cited rulings on evidence, it is entirely reasonable to suppose that the jury understood this instruction to mean that general capacity to distinguish right from wrong and to deliberate and premeditate rather than actual deliberation and premeditation constituted the standard of guilt of murder in the first degree; and thus there was clear error. Certainly, we cannot say that such was not the jury's understanding of the instruction.

Dementia praecox, it was testified, is a major psychosis; it is insanity which begins in adolescence. It is characterized

by emotional impairment; and "frequently" it is attended by "hallucinations, delusions, negativeness, rigidity, and so forth." Further inquiry in this direction was barred by the judge on the plainly erroneous assumption that a general capacity to know right from wrong on the day of the homicide was the test of guilt and degree. We may take judicial notice of the fact that dementia praecox, more lately classified as schizophrenia, is a form of insanity which has its inception in puberty or adolescence, usually with a hereditary background, and is attended by a mental or physical lack of potentiality for development; the individual is "stranded on the rock of puberty." The onset may be acute, but usually it develops insidiously over a long period of time, and, while not utterly hopeless, is in the vast majority of cases a chronic condition which leads to a progressive dementia. The paranoid form, the worst in this respect, sometimes comes later in life and is characterized by delusions of persecution and grandeur. All this may be had from the standard works on mental diseases and insanity, and suggests the scope of a legitimate field of inquiry if the judge had not closed the door by what, I am clear, was a fundamental misapprehension of the law.

The proofs indicate a conforming behavior pattern. The accused was given to fits of temper and violence and alternate excitement and depression. As to the homicide, he testified that he met his wife on the street and, addressing her in terms of endearment, suggested that they "be more charitable towards each other for Christmas;" that thereupon his wife struck him across the mouth with her purse so violently as to break a tooth and gash his lip; and that he then "experienced pain in" his head, his mind became blank, and he was unaware of what happened in the interval void of consciousness; and that he surrendered to the police early the next day when he learned from a newspaper what had happened. A police surgeon who examined the accused gave corroborating testimony as to the injury. He found a left lower central incisor broken off and "a very minute abrasion inside the lower lip opposite the broken section;" and he said this "could

have been sustained in the manner" related by the accused. The accused explained that he carried the gun as a protection against certain of his wife's kinsfolk who had threatened him with violence. The threats may have been real or fancied. There is evidence that the accused had "persecutory ideas." Or it may be that in all this the accused was guilty of conscious prevarication. But that is not the question in ,this court. The accused has a constitutional right to a determination of the factual issues by a jury of his peers, guided by the law, expounded in clear and unmistakable terms.

But however this instruction may be viewed, the rejected evidence was admissible on the issue of criminal responsibility. If, at the time of the shooting, the accused, by reason of temporary insanity, was incapable of differentiating right from wrong, he is not guilty of murder. Unless he was conscious that it was an act which he ought not to do, there was a lack of moral or criminal responsibility. *State v. Lynch,* 130 *N. J. L.* 253 (*E. & A.* 1943). Such evidence was relevant also on the issue of the existence of the deliberation and premeditation which are the constituent elements of murder in the first degree. The impact of encounter on the mental processes of the accused, conditioned and circumstanced as he was, is a factor bearing strongly on criminal responsibility and degree. And the validity of temporary insanity as a defense was repudiated in other passages of the charge. Although holding that the proofs conclusively demonstrated legal sanity and full accountability, the judge quite inconsistently instructed the jury on the subject of insanity. He defined it in terms of a fixed and continuous mental condition that excluded temporary insanity. The charge in this respect was contrary to law and contradictory and confusing.

I would reverse the judgment and direct a *venire de novo.*

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Justice HEHER—1.