**Petition of Joseph ERNST for a Writ of Habeas Corpus.**

**No. 13562.**

United States Court of Appeals
Third Circuit.

Argued June 8, 1961.

Decided Aug. 31, 1961.

Chester Apy, Red Bank, N. J., for appellant.

Norman Heine, Camden, N. J., for appellee.

Before BIGGS, Chief Judge, and HASTIE and FORMAN, Circuit Judges.

HASTIE, Circuit Judge.

A jury in the County Court of Camden County, New Jersey, has convicted the petitioner, Joseph Ernst, of murder in the first degree, without recommendation of life imprisonment. Under such a verdict New Jersey law makes a death sentence mandatory, and the petitioner has been so sentenced. The Supreme Court of New Jersey affirmed the conviction and sentence. State v. Ernst, 1960, 32 N.J. 567, 161 A.2d 511. The Supreme Court of the United States denied certiorari. 1961, 364 U.S. 943, 81 S.Ct. 464, 5 L.Ed.2d 374. Ernst then filed this habeas corpus petition in the District Court for the District of New Jersey. The petition was denied without the taking of testimony. This appeal followed.

The deceased, Joan Connor, was a seventeen year old former girl friend of the petitioner. At the time of the homicide he was twenty-two years old and a parolee from the Bordentown Reformatory. Both the petitioner and Joan lived in Camden. In the course of a quarrel some ten days before the homicide he had struck her, inflicting a scalp wound serious enough to require sutures. This assault led Joan's father to sign a criminal complaint against the petitioner, who fled to Newark.

On the evening of the homicide the petitioner, accompanied by a friend, Robert Lee, returned to Camden. Petitioner was armed with a revolver. He visited the home of a neighbor and there stole a second revolver. He spoke to a neighbor about having returned to Camden seeking revenge. He and his companion then set out to find Joan and a man named Linden whom Ernst mistakenly believed to have made the criminal complaint against him. They located Joan at the Linden home. When she came to the door there was a brief exchange of words. According to the petitioner, Joan spoke insultingly to him and slammed the door in his face. Almost immediately revolver shots were fired through the door fatally injuring the girl. Petitioner fled and was subsequently apprehended. Later he made three confessions, admittedly voluntary, stating essentially the facts outlined above. In two confessions he admitted doing the shooting. In the third, however, he claimed that Lee fired the fatal shots.

Petitioner did not obtain counsel for his own defense. Accordingly, the court assigned Joseph P. DeLuca, an active trial lawyer in Camden County with more than twenty years of experience at the bar, to be defense counsel. Since his conviction, petitioner has retained another attorney who now represents him. One of the principal contentions in the present collateral attack on the conviction is that the conduct of the defense by trial counsel was so deficient as to constitute a denial of such benefit of counsel as the Fourteenth Amendment requires a state to provide for a person accused of a capital offense.

In United States ex rel. Darcy v. Handy, 3 Cir., 1953, 203 F.2d 407, a majority of this court sitting en banc joined in the opinion of Judge Maris on the question whether the alleged mishandling of the defense in a murder trial by counsel of defendant's own choice constituted a failure of the state to afford the accused due process of law. The limited reach of the due process clause in such a situation was stated as follows:

"It is true, as the relator urges, that a denial of due process of law by the state would result if the representation of a defendant by his counsel should be so lacking in competence or good faith that it would become the duty of the trial judge or the prosecutor, as officers of the state, to observe and correct it. For in such a trial the defendant would be practically without representation and it would, therefore, be but a farce and a mockery of justice. It is the duty both of the trial judge and the prosecutor to see that the essential rights of the defendant are preserved. As officers of the state their failure to do so is imputed to the state. But they, and through them the state, may not be convicted of a denial to the defendant of due process of law in this regard unless the incompetence of the defense is so apparent as to call for intervention between counsel and client." 203 F.2d at page 427.

This case differs from the Darcy case in that counsel here was assigned by the court rather than chosen by the accused. Whether in a borderline case this difference might tip the scales in favor of petitioner's claim that the state had not discharged its full constitutional duty to provide him with a fair trial, we need not decide. Compare the division of the Court of Appeals for the District of Columbia in Mitchell v. United States, 1958, 104 U.S.App.D.C. 57, 259 F.2d 787. In this case we find it quite clear that there was nothing in the professional history or standing of counsel and nothing in his conduct of the trial which either made his appointment to defend a capital case improper or provided cause during the trial for corrective judicial interference with counsel's handling of the defense.

In petitioner's own brief on this appeal it is recognized that assigned counsel was a well qualified and experienced trial lawyer six of whose twenty-one years at the bar had been spent as a deputy prosecutor in the county where this trial was held. Even now his overall professional competency is not challenged. Clearly, his appointment was a proper discharge of the court's initial responsibility to assign competent and responsible counsel.

■ Petitioner now criticizes various actions and omissions of defense counsel at the trial. However, we think the matters of which petitioner complains fall far short of establishing that the defendant did not receive professionally acceptable representation and assistance in the conduct of his defense. We approach the problem as did the Court of Appeals for the District of Columbia when it said: "[A]bsence of effective representation of counsel * * * must mean representation so lacking in competence that it becomes the duty of the court or the prosecution to observe it and correct it." Diggs v. Welch, 1945, 80 U.S. App.D.C. 5, 148 F.2d 667, 670.

■ Petitioner makes much of the fact that counsel neither introduced evidence nor made an argument calculated to persuade the jurors that they should

recommend mercy, even if they should find the accused guilty of murder in the first degree. The record shows that beginning with his opening statement and continuing through his summation defense counsel took and sought to sustain the position that the shooting was not deliberate or premeditated and, therefore, that there could not properly be a first degree verdict, either with or without a recommendation of mercy. He made this clear in his opening statement, saying: "If this boy did the shooting * * * it is nothing more, and I mean nothing more, and I want to say it, that it is a fact that it is second degree. I say to you * * * that all the evidence will not substantiate any verdict of first degree. It has got to be the lesser." In his effort to establish and maintain this basic position counsel took several steps which petitioner now views as depriving him of the kind of defense to which he was entitled. Counsel commended the police for their work in solving the case and apprehending defendant and his companion. This was not hurtful since there was no dispute, indeed petitioner had admitted, that the right persons had been apprehended. Along the same line counsel spoke of his own experience with the fairness of jury verdicts when he was a prosecutor. This, of course, implied fairness in acquittals as well as convictions. He added that everyone had to accept whatever verdict the jury rendered, at the same time reminding the jurors that they would have to live with their own consciences after the verdict. Since there was no basis for disputing that the defendant or his companion had committed a felonious homicide, counsel also stated that he did not condone his client's behavior, though even after hearing his client on the stand he was not sure exactly what happened at the time of the homicide. This last concession must be considered in the light of the fact that contradictory statements appeared in petitioner's confessions. Understandably, counsel may have reasoned that his most helpful course would be to express his own uncertainty as to what the facts were, hoping that the jurors would be similarly puzzled and would give the defendant the benefit of the doubt.

This was a case in which counsel could reasonably have believed that the evidence of felonious homicide by his client was so overwhelming that to go beyond urging the absence of premeditation would outrage and offend the jury to his client's detriment. On the other hand, the making of concessions which did not weaken the claim that the shooting was not premeditated might emphasize this critical issue and dispose the jury to view it dispassionately. Moreover, a show of candor by counsel is often calculated to impress a jury favorably. In brief, counsel's various maneuvers may have been part of a strategy of developing a setting and an atmosphere in which the area of controversy would be narrowed to grounds of his selection and in which counsel would be viewed by the jurors as joining with them in the sober and dispassionate search for justice.

Petitioner places special emphasis upon an additional statement by counsel to the jury that he approved the New Jersey statute which provided the death penalty for first degree murder. But, at the same time, he emphasized his position that this was not a first degree case and that before "a person is convicted under the capital statute that every letter of that statute must be met. Where there is doubt, it should not be upheld, because once a life is taken, you cannot erase that error * * *." Here again counsel apparently was seeking to avoid unnecessary controversy with jurors who might approve capital punishment and at the same time to concentrate attention on the issue of absence of premeditation upon which he would make the case turn.

In this connection, counsel was able to develop some evidentiary basis for his argument that the shooting was not deliberate and premeditated. He showed that the accused made himself known to people at a tavern immediately before he went in search of the victim. He emphasized the position that verbal castigation and the slamming of a door in

petitioner's face created a spontaneous violent reaction in sudden unreasoning anger.

It is argued that in confining his presentation to the issue of premeditation counsel recklessly and to his client's detriment placed all his eggs in one basket. Yet, he may well have reasoned that the force of his argument that the crime was committed in sudden hot blood would be weakened in the jury's view by offering an alternative plea for mercy if premeditation should be found. Moreover, it is to be remembered that the judge himself must, as the judge did in this case, explain to the jury its responsibility for considering the granting of mercy in connection with a first degree verdict. So that issue was not eliminated from the case.

Viewing the case in its entirety, and in the light of petitioner's confessions, it is obvious that the defense had little to work with. Moreover, the items of which petitioner complains could well have been part of a rational plan of a competent lawyer trying to do his best for his client. Certainly, the Constitution does not require the state to provide more than that in the way of effective assistance of counsel in a capital case.

■ As a second major point petitioner urges that the New Jersey statute under which he has been sentenced is so unfair and discriminatory that it denies persons sentenced to death thereunder due process of law and the equal protection of the laws. The New Jersey statute reads:

"Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.

"Every person convicted of murder in the second degree shall suffer imprisonment for not more than

30 years." N.J.S. 2A:113-4, N.J. S.A.

Petitioner's first criticism of the statute is that it provides no standard to guide the jury in deciding whether the penalty for first degree murder shall be death or life imprisonment. True, the jury is left to choose between these penalties "upon and after the consideration of all the evidence", but otherwise without authoritative criteria for the measurement of culpability or extenuation. But such unguided discretion in the choice between penalties which may be imposed under a first degree verdict has long been characteristic of the laws of the United States and of many states. Some twenty states confer this power upon juries in murder cases. See the compilation of such statutes in Knowlton, Problems of Jury Discretion in Capital Cases, 1953, 101 U. of Pa.L.Rev. 1099, 1101-1103. See also the discussion of these statutes in the concurring opinion of Mr. Justice Frankfurter in Andres v. United States, 1948, 333 U.S. 740, 758-763, 68 S.Ct. 880, 92 L.Ed. 1055. Similarly, the pertinent federal statute provides that "whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment' in which event he shall be sentenced to imprisonment for life." 18 U.S.C. § 1111. Both recent and early decisions of the Supreme Court sanction this sentencing scheme. Andres v. United States, supra; Winston v. United States, 1899, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456. We have discovered no successful attack upon any similar state statute on the ground that it fails to provide guide lines for the jury in its choice between the death penalty and life imprisonment. This may well be because it is neither practicable nor desirable that any stated criteria should control a jury in deciding whether the circumstances of a premeditated murder are such that draconic punishment should not be imposed. Moreover, it is a matter of legislative history in most jurisdictions, certainly in New Jersey, that the conferring of this power upon

juries is potentially advantageous and, in no way hurtful to persons convicted of first degree murder, for the antecedent statutes rather generally made the death sentence mandatory in all such cases. Contrast the present New Jersey law, N.J.S. 2A:113–4, N.J.S.A., with its antecedent, P.L.1898, ch. 235, § 108. In the laws of the United States, contrast 18 U.S.C. § 1111 with Rev.Stat. § 5339. Indeed, the New Jersey courts analyze the present statute as retaining the death sentence as the legislatively prescribed punishment for first degree murder, while adding a special procedure for mitigation wherever the circumstances shall lead the jury so to provide in its verdict. State v. Molnar, 1945, 133 N.J.L. 327, 44 A.2d 197. This method of sentencing may be less than ideal. See Knowlton, supra, 101 U. of Pa.L.Rev. at 1130–1136. Yet, a device in mitigation certainly is not essentially unfair to the wrongdoer because the jury's power to reduce the normal penalty is not controlled. The argument that due process of law has been denied is without merit.

Petitioner's final objection to New Jersey sentencing procedure in murder cases is that the jury does not have the benefit of a pre-sentence investigation and report. This is said to be discriminatory because present New Jersey rules of court require that a judge shall obtain a pre-sentence report before he passes sentence for any other serious offense. R.R. 3:7–10(b). This is said to be an arbitrary differentiation in the treatment of offenders and, therefore, a denial of equal protection of the laws to those convicted of murder. But the basic differentiation occurred when the legislature made first degree murder punishable by death or by life imprisonment, as a jury may determine, while in the cases of lesser offenses the trial judge was vested with discretion as to the sentence to be pronounced and whether to require confinement or to grant the convicted person probation. Even the petitioner does not say that this distinction in legislative treatment of the matter of punishment for different crimes is in itself a denial of the equal

protection of law. But once this is conceded it ceases to be significant that in administering their sentencing power the courts of New Jersey have seen fit to make a pre-sentence investigation and report a mandatory procedure. Administrative differences are reasonably to be expected in procedures as dissimilar as jury sentencing for first degree murder and sentencing by a judge for lesser crimes. Moreover, New Jersey has made available to every person charged with murder some of the advantages of a pre-sentence investigation by permitting him to include evidence in mitigation as part of his defense. See State v. Mount, 1959, 30 N.J. 195, 152 A.2d 343. But apart from this, we do not view the difference between sentencing procedures of which the defendant complains as the kind of arbitrary and unreasonable differentiation which the equal protection clause forbids.

In finding the petitioner's constitutional contentions to be without merit, we have not overlooked the fact that these issues were not brought to the attention of the New Jersey courts except by petition for rehearing after the New Jersey Supreme Court had affirmed petitioner's conviction. And even then the constitutional issues were not disclosed in all of the aspects now presented to us. It is arguable, therefore, that there has not yet been such exhaustion of state remedies as Section 2254 of Title 28 U.S.C. requires before a federal court shall discharge a state prisoner pursuant to a writ of habeas corpus. However, as was pointed out in the concurring opinion in United States ex rel. Auld v. Warden, 3 Cir., 1951, 187 F.2d 615, 620, it is not Section 2254 but rather Section 2241 which gives the district court power to entertain and dispose of petitions for habeas corpus. Section 2254 merely requires as a matter of national policy that, in the exercise of that power, affirmative relief shall not be granted to a state prisoner until he shall have exhausted the remedies available in the state courts. Denial of a state prisoner's petition for habeas corpus on its merits remains per-

missible under Section 2241 even though state remedies may not have been exhausted. See also the opinion of Judge Maris in United States ex rel. Darcy v. Handy, supra, 203 F.2d at 421.

The judgment will be affirmed.

BIGGS, Chief Judge (dissenting).

The decision in this case overrules United States ex rel. Auld v. Warden, 3 Cir., 1951, 187 F.2d 615, *sub silentio*, for here, as the majority opinion points out, "there has not yet been such an exhaustion of state remedies as Section 2254 of Title 28 U.S.C. requires before a federal court shall discharge a state prisoner pursuant to a writ of habeas corpus". I would vacate the judgment and would remand with the direction to the court below to allow the petitioner a reasonable opportunity to exhaust his state remedies, retaining jurisdiction and staying the execution of the state sentence in the meantime. Comity between the state and federal processes requires this result.