STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALFRED M. WOLAK, DEFENDANT-APPELLANT.

Argued December 16, 1957—Decided April 3, 1958.

468

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for plaintiff-respondent *(Mr. Charles S. Joelson,* Deputy Attorney-General, Acting Passaic County Prosecutor, attorney).

*Mr. Richard Yale Feder* and *Mr. Leonard I. Garth* argued the cause for defendant-appellant.

The opinion of the court was delivered by

FRANCIS, J. Defendant Alfred Wolak was convicted of murder in the first degree and, pursuant to the recommendation of the jury, was sentenced to life imprisonment. On this appeal he seeks a reversal of the conviction, charging that the trial court erred (1) in instructing the jury with respect to the nature of the consideration that it could give to evidence of previous convictions of crime, and (2) in admitting into evidence a "gruesome" photograph of the deceased. He urges also that he was denied due process because of inadequate representation by court-assigned counsel.

The homicide out of which this trial arose occurred on Sunday, August 12, 1956, at approximately 1:45 P. M., in Pip's Tavern at 35½ Bergen Street, Passaic, New Jersey. The victim was Stanley "Pip" Kalita, husband of Mildred Kalita, the owner of the establishment. He was shot by Wolak, who was 21 years of age at the time.

The record reveals that sometime in March of 1956 Wolak began to patronize Pip's Tavern. Thereafter, he came in once or twice a week and became well known to the Kalitas. On occasions he was permitted to buy drinks on credit and once, in April 1956, Mildred Kalita loaned him $25.

On the evening of April 22, 1956 Wolak was at the tavern drinking with his friend, Harry Ladischeff. They became involved in an argument which eventuated in a fist fight. Mildred Kalita, who was in charge of the place at the time, came out from behind the bar and told them to stop fighting. They did so, but resumed their scuffling as soon as she returned to her place at the bar. She went over to them again and asked them to leave, whereupon Wolak pushed her to the floor. She got up and once more demanded that they leave. In response, Wolak slapped her face. She then tried to enter the telephone booth to call the police but they prevented her from doing so and still refused to leave. She insisted that they at least allow her to call her husband, and they told her to go ahead as they were not afraid of him. She called her husband immediately and he said he would be right down. When she left the booth, Wolak continued abusing her and again refused to leave. He demanded drinks for himself and Ladischeff, and when she would not comply he began pushing her. While he was thus occupied, Stanley Kalita appeared and punched Wolak in the face. Wolak fell to the floor and remained there. Ladischeff then attacked Kalita and while this altercation was in progress, the police arrived. They picked up Wolak from the floor and as he was led away, he turned to Kalita and said: "I will get you for this." Mrs. Kalita refused to sign a complaint against him, but he was fined $55 and sentenced to ten days in the county jail. He was released after two days.

Several weeks later Wolak telephoned Mildred Kalita and apologized for his behavior. She accepted the apology but told him not to come to the tavern any more. However, he did return there on approximately three occasions prior to August 12, the day of the shooting. On one of these visits he arrived in an extreme state of intoxication, spoke to no one, and passed out at the bar.

One night in mid-May 1956 the Kalitas were in Garrone's restaurant in Passaic. Wolak and Ladischeff came in and went over to them. Wolak apologized to Stanley Kalita

for the trouble he had caused, and said that if someone had slapped his, Wolak's, wife, he would have retaliated as Kalita had. But Mildred Kalita testified that a few minutes later Wolak said to Kalita, "I didn't like the idea of you having me arrested," and "So what would you do if I went home and got my gun and held you up some night? As a matter of fact, I think I will go home again and get my gun and blow your brains out." Kalita tried to placate him, pointing out that his wife had not pressed charges, but Wolak said that he could not forget what had happened. Kalita offered to buy Wolak a drink, and the group repaired to a tavern across the street. The Kalitas left after one drink.

On July 22, 1956 Wolak and Ladischeff went to Pip's Tavern at about 2 P. M. Both Kalitas were present. Wolak, apparently sober, reproached Kalita for having hit him, and tried to get him to go outside and fight. He was heard to say, "I can't forget what you done. I will get you for this. It will take me a while, but I will get you for this." Kalita passed off these remarks, and there was no further incident.

On Sunday, August 12, 1956, Wolak came into Pip's Tavern alone at approximately 1:40 P. M. The Kalitas had just opened for business, and were seated at the extreme end of the bar near the entrance door. Stanley Kalita was drinking a bottle of beer. There were four or five customers at the bar, and a part-time bartender was serving drinks. When Wolak entered, he passed the Kalitas without speaking to them, and went to the other end of the bar, sat on a stool, and ordered whiskey. As soon as he sat down, he drew a .32 caliber revolver from his pocket and placed it before him on the bar. Mildred Kalita saw him do this and warned her husband. Wolak then called to Kalita, "Pip, come over here." Kalita replied, "If you want to talk to me, put that gun away and come over to me," or words to that effect. Wolak then picked up the revolver in his right hand, rose to his feet, and pointed the weapon at Kalita. He repeated his summons and Kalita, standing

up, again told him to put the gun away. When Wolak commanded Kalita for the third time to come over, the latter grabbed an empty beer bottle from the bar and threw it at Wolak. Simultaneously, Wolak fired the revolver once and wounded Kalita, who was in the process of crouching below the level of the bar. The bullet entered Kalita's upper left arm and continued on an upward course, perforating both lungs and the aortal arch. Kalita made his way outside the tavern to the corner of Market and Bergen streets, where he collapsed and died.

Immediately after the shooting, Wolak walked out of the tavern and left the area, heading up Bergen Street. The police were notified of the homicide, and that afternoon they traced Wolak to the Hollywood Tavern at 170 Passaic Street. Police officers and detectives drove there to apprehend him and, as they approached the tavern on foot, Wolak appeared in the doorway and drew his revolver. He was told to drop it, but he fired on the policemen and took cover. After an exchange of shots, with Wolak shooting through the open door of the tavern, he was wounded very slightly and fell to the floor. Police Captain Bingham went in after him, kicked the gun from his hand, and started to carry him outside. Upon being told that it was all over, Wolak replied, "All over? I should have knocked off four or five of you bastards and then it would be all over." He continued to swear at the police officers during a search of his person which disclosed a box of .32-caliber bullets. While they were awaiting an ambulance, Wolak attempted to pull away, and was ordered handcuffed. He was taken to the hospital for treatment, and about an hour later to the Detective Bureau of Police Headquarters, where he was interrogated. In response to a question as to why he had shot Kalita, Wolak replied that he had had it coming. And according to one of the officers, when asked why he carried the gun into the tavern, he replied, "What are you looking for, premeditation?"

The principal defenses were that the killing was not premeditated and that Wolak was insane at the time.

In presenting these contentions defense counsel brought out much of Wolak's personal history on direct examination. Wolak did not complete grammar school but went from the eighth grade to vocational school at the age of 14. In 1949, when he was 14 years of age, he "was sent" to the Jamesburg State Home for Boys for breaking and entering into a gasoline station. He remained there for nine months, and was released in 1950. In 1951, at 16, he "was sent" to Annandale Reformatory for breaking and entering into a cleaning establishment. He escaped from there and was recaptured and "sentenced" to Bordentown Reformatory. He was released in May 1953, at 18 years of age.

In August 1954 Wolak was in a serious automobile accident, suffering a broken neck and a brain concussion. The accident was the culmination of the pursuit by the police of a stolen car in which he was a passenger; the driver, to avoid capture, had been travelling 85 to 90 miles per hour. On August 19, 1954 Wolak was taken to the Valley Hospital in Ridgewood, but he was transferred to Bergen Pines Hospital where he was not only a patient but also was being held on a charge of breaking and entering. On August 31 he underwent an operation. Two holes were drilled in his skull so that Crutchfield Tongs could be inserted and used for the purpose of taking his jaw out of traction. His confinement at the hospital continued until December 11, 1954, when he escaped. After being at large for about a week, during which time he allegedly suffered from pains in the neck and head, and had blackouts, he surrendered to the Passaic police, who had him returned to Bergen Pines. He was discharged from that institution in October 1955, and was then taken to Bordentown Reformatory for parole violation, apparently because of his escapade with the stolen car and the undescribed breaking and entering offense. (The psychiatrist produced by the defense mentioned that Wolak was arrested for burglary in March 1955 and "served two months in the Bergen County Jail for that crime." Whether that was the breaking and entering offense referred to by the defendant himself is not at all clear. It

seems unlikely that there could have been a burglary in March 1955, since everything points to his presence in the hospital at that time. The State offered no corroborating proof on the subject. If such a conviction occurred, it was the only one not within the category of juvenile offenses as distinguished from crimes.) Within the month, Bordentown released him and he went home to his parents in Passaic.

All during the hospitalization and detention, he claimed to have suffered headaches, pain, dizzy spells and blackouts. These conditions were said to have continued after he returned home and to have become progressively worse down to the day of the fatality. He asserted that in an effort to relieve the pain, he started to drink liquor and to take "goof balls," which he believed to be narcotics of some kind (the actual ingredients were not disclosed at the trial). They were said to have been purchased on a public street in New York City from a person known to him only by a first name. The clear indication from the testimony on this matter is that if he did use such pills, he was far from frank in disclosing the circumstances of their acquisition. There was no indulgence in alcohol or narcotics before the automobile accident. The use began only after his release from Bordentown when his headaches were so severe that he "just didn't care about anything."

Wolak testified that on the evening of April 22, 1956 he took two or three "goof balls" before going to Pip's Tavern, and that he has no recollection of the fight there, his arrest, or that he made any threats to Kalita. He denied having threatened Kalita at Garrone's restaurant several weeks later and he insisted upon a complete absence of any recollection of arguing with or threatening Kalita on July 22, 1956.

On one occasion (he said) when he was sober and had taken no drugs, a strange feeling came over him while he was reading a book and the next thing he knew he was down by the Passaic River some considerable distance from home.

Testimony was produced to show that on prior occasions Wolak, while drunk, had committed acts of violence which

he did not recall the next day. For example, he made an unprovoked attack upon a stranger in a restaurant. About a week before the shooting, while in another restaurant, he suddenly rose and knocked over coffee, napkins and other articles. The witnesses to these incidents, who were acquaintances, asserted that thereafter he had no recollection of them.

In January or February 1956 he bought an automatic pistol from a patron in a tavern with the intention of killing himself with it. He kept it in the attic of his parents' home and never carried it on his person—except, of course, on the fatal day.

The record does not show that he ever engaged in any employment except during a period of four or five weeks prior to August 12, 1956. He quit working a short time before the homicide on account of his various pains. A very young girl became his wife on June 9, 1956.

On Saturday, August 11, 1956, he stayed home all day on account of pain in his head and neck. In the evening, after swallowing two "goof balls," he left the house and went to a tavern. His sister described him as being pale and glassy-eyed at the time. He said he did not take the gun with him. From then on, he drank all night long at various places. 6 A. M. Sunday found him in a tavern in South Hackensack where he and a friend consumed liquor until noon. Witnesses described him as "staggering drunk" and "stone drunk." The drinking companion at the South Hackensack bar had to help him walk. His whereabouts between 12:30 and 1:40 P. M. were not accounted for by any witness. Wolak testified to a vague memory of further drinking with Ladischeff at some unspecified place.

Wolak insisted that he had no recollection of going home for the gun, of entering Pip's Tavern at 1:40 P. M., or of the shooting. (One of the State's eyewitnesses to the killing said that Wolak's eyes were glassy; he had a "mad cat look" and "he just looked like his face was hanging down"; "he had an hysterical look"; "he looked mad.") He next remembers sitting at a bar with a woman who was saying,

"Please go. Please go." So he started out and the shooting began. Then he blacked out and came to himself in the cell the next morning.

After being given first aid at the hospital where the treating physician said he was "terrific drunk" and mentally "obnubilated," Wolak was taken to police headquarters and interrogated and a question-and-answer statement was taken from him. However, it was never introduced in evidence. The following day, August 13, he was returned to the hospital and treated for epigastric pain. The diagnosis was acute gastritis, apparently caused by drinking without eating.

The defense produced Dr. Nelson C. Policastro, a psychiatrist, in support of the defense of insanity. He had examined Wolak on one occasion, November 4, 1956, in order to give an opinion on the subject. On the witness stand, the doctor recited the history obtained from the accused which conformed substantially with the personal history outlined above. In detailing this history, the emphasis was on Wolak's early offenses and confinements. In referring to them he spoke of Wolak as having been "apprehended" and "was sent" or "sentenced." The term "conviction" or "convicted" was not used, although obviously it was implied.

In answer to a long hypothetical question which covered the psychiatric examination, the anti-social criminal career, the severe injuries suffered in the automobile accident, the use of "goof balls" and liquor thereafter, and the prolonged drinking bout which led up to the shooting, the doctor expressed the view that Wolak "presented a psychopathic personality, a constitutional psychopathic personality," meaning "that he manifested abnormal behavior, anti-social acts, since the age of fourteen, * * * so much so that the history of his life reveals that from the age of fourteen until the incident that happened in this case * * * he was persistently in trouble and I feel that he was mentally sick * * *."

Furthermore, the doctor asserted that the defendant had a schizoid character; that is, "he presented a withdrawal from society" and "had a poor inter-personal relationship

with people." People with a constitutional psychopathic personality indulge in "drug addiction, alcoholism, excessive sexual practice, lying, stealing. They are always in conflict with the law." He was suffering from simple psychopathic schizophrenia. This type is not accompanied by delusions or hallucinations. It is characterized by a split personality and the person "may withdraw himself from society * * *" and "may just show abnormal behavior."

It was Dr. Policastro's opinion that the combination of the "goof balls" taken on Saturday evening and the long period of drinking was such that Wolak was "mentally sick" at the time of the killing and "did not know the quality of the act," that is, he did not know its "harmfulness" or its "seriousness"; * * * "he did not know that somebody would die." At the time he could not "differentiate between right and wrong; * * * he had no judgment whatsoever."

Finally, the doctor said also that from the facts given to him and from the psychiatric examination, it was his opinion that when the crime was committed, Wolak was not capable of deliberation or willfulness or of forming an intent to kill.

The State produced a psychiatrist who described Wolak as a "sociopathic personality," which term he said has the same significance as "constitutional psychopathic state" or "psychopathic personality." The characteristics of such a personality were outlined in substantially the same terms as those used by Dr. Policastro. One such attribute was conceded to be constant conflict with the law. However, he found no evidence of any psychosis or insanity and he felt that the accused was and is capable of differentiating right from wrong and of understanding the nature and quality of his acts.

New Jersey has long recognized and followed the test of insanity as a defense against responsibility for the commission of crime laid down in the well-known *M'Naghten's Case*, 10 *Cl. & Fin.* 200, 8 *Eng. Rep.* 718 (1843). That test is whether the defendant, at the time of the doing of

the act complained of, was suffering from such a disease of the mind as to be unable to know the nature and quality of the act he was doing, or, if he did know, that he did not know that what he was doing was wrong. *Mackin v. State,* 59 *N. J. L.* 495, 497 (*E. & A.* 1896); *State v. Cordasco,* 2 *N. J.* 189 (1949). (The propriety of the rule as an instrument for the accomplishment of justice in the administration of the criminal law is not challenged here.) The statement of Dr. Policastro, taken literally, brought Wolak within the ambit of this rule and the trial court, being of the view that a jury question as to his legal insanity had been created, delivered a full and most fair charge on the subject.

A critical evaluation of the doctor's testimony indicates that he did not say that Wolak's status as a constitutional psychopathic personality of itself rendered him insane when the gun was fired. In substance, he seemed to conclude that such a personality, in combination with the goof balls taken on Saturday night, and particularly with the alcohol imbibed over the 16-hour period before the shooting, brought about legal insanity. And during the trial and in summation, defense counsel stressed and ostensibly placed principal reliance upon the fairly obvious intoxication. But the sufficiency of the proof was not pursued on cross-examination, and on the whole record it cannot be said that justification existed for removing the element of insanity from the case.

Voluntary intoxication is no defense for crime. If, however, the state of intoxication is such as to prostrate the faculties and to render the accused incapable of forming the specific intent to take life, the offense, in cases of the present type, may be mitigated to murder in the second degree. Whenever deliberation and premeditation are essential elements of the crime, and by reason of drunkenness "or any other cause" the defendant's mental state is such that he is incapable of deliberation and premeditation, murder in the first degree is not committed. *Warner v. State,* 56 *N. J. L.* 686 (*E. & A.* 1894); *Wilson v. State,* 60 *N. J. L.*

171 (*E. & A.* 1897); *State v. Burrell,* 120 *N. J. L.* 277 (*E. & A.* 1938); *State v. Tansimore,* 3 *N. J.* 516 (1950); *State v. Roscus,* 16 *N. J.* 415 (1954).

 Thus, accepting the premise that insanity founded on a constitutional psychopathic personality was not established, but assuming that voluntary drunkenness was superimposed on that mental weakness to the extent that it produced for the time being an inability to distinguish between right and wrong, the crime would not be excused on the ground of insanity. However, in such case it would not have been proper to strike the evidence as to the mental state and the drunkenness from the record. The jury was entitled to consider it on the issue of the degree of murder involved. No question is raised as to whether such evidence, even if not sufficient to prove insanity, might be used by the jury in deliberating on the question as to whether life imprisonment should be recommended, if the conclusion was reached that murder in the first degree had been proved. *Wilson v. State, supra; State v. Schilling,* 95 *N. J. L.* 145, 148 (*E. & A.* 1920); *State v. Cordasco, supra; N. J. S.* 2A:113–4; and see *Weihofen, "Partial Insanity and Criminal Intent,"* 24 *Ill. L. Rev.* 505, 517 (1930). In this connection note may be taken of our present stringent rule to the effect that only evidence relating to the issue of guilt or innocence may be considered in the course of such deliberation. *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Cordasco, supra; State v. Barth,* 114 *N. J. L.* 112 (*E. & A.* 1935); *State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909); compare the Pennsylvania rule: *Commonwealth v. Thompson,* 389 *Pa.* 382, 133 *A. 2d* 207 (*Sup. Ct.* 1957), *certiorari* denied 355 *U. S.* 849, 78 *S. Ct.* 77, 2 *L. Ed. 2d* 59 (1957); *Commonwealth v. Bibalo,* 375 *Pa.* 257, 100 *A. 2d* 45 (*Sup. Ct.* 1953); *Commonwealth v. Elliott,* 371 *Pa.* 70, 89 *A. 2d* 782 (*Sup. Ct.* 1952); *Commonwealth v. Simmons,* 361 *Pa.* 391, 65 *A. 2d* 353 (*Sup. Ct.* 1949), *certiorari* denied 338 *U. S.* 862, 70 *S. Ct.* 96, 94 *L. Ed.* 528 (1949); *Commonwealth v. Wooding,* 355 *Pa.* 555, 50 *A. 2d* 328 (*Sup. Ct.*

1947); *Commonwealth v. Dearolph,* 41 *D. & C.* 643 (*O. & T.* 1941); 18 *Pa. Statutes,* § 4701; 24 *Ill. L. Rev.* 505 (1930).

██ But we return to the defense of insanity, as such, in this case. As has been indicated, the trial court charged the jury fully, fairly and liberally on the matter. After doing so, however, he pointed out that the law presumes every man to be sane and that when a defendant asserts the defense of insanity, the burden is upon him to overcome the presumption and to prove by the greater weight of the evidence that at the time of the shooting he did not have the mental capacity to distinguish between right and wrong. Then he told the jury that the State had taken issue with the defense of insanity, asserting that Wolak was in fact sane and offering testimony to that effect, thus creating a situation where the jury would have to determine where the truth lay. He advised them with respect to the defendant's position on the subject of intoxication and the taking of "goof balls," and said that the State had taken issue with the contention that his mental faculties were so prostrated that he was incapable of forming an intent to take life, contending that Wolak was capable to form and did form the intent to take Kalita's life and that "having such intent he carried it out willfully, with deliberation and premeditation, and accordingly is guilty of murder in the first degree."

After describing the two important claims of insanity and discussing the allegation that intoxication had prostrated Wolak's faculties so as to make him incapable of forming the requisite intent, the court made crystal clear that the issue was one of credibility, that the jurors were to determine the true facts, to judge the truthfulness of the witnesses, to weigh and consider all the evidence, including any contradictions and inconsistencies. And:

"In weighing and considering the evidence, you will naturally take into consideration the interests of those who are called as witnesses, their general demeanor while on the witness stand and the impressions that they created in your minds.

\* \* \* \* \* \* \* \*

If you believe that a witness knowingly and willfully testified falsely to any material fact in this case, you may give such weight to his or her testimony on other points as you may think it is entitled to, or, you may disregard it altogether.

\* \* \* \* \* \* \* \*

Now, the defendant, Alfred Wolak, has offered himself as a witness and has testified in his own defense. He has admitted prior conviction of crime. This evidence was offered and received *merely* for the purpose of affecting his credibility as a witness. The jury *must* consider such prior conviction for the *sole purpose of determining his credibility* as a witness at this trial, *and for no other purpose whatsoever.*" (Emphasis added)

This last-quoted paragraph embodies the crucial assertion by the defendant of prejudicial error. In isolation, it represents the conventional instruction to the jury as to the limited effect to be given to proof of a defendant's previous conviction of crime. But Wolak says that here the criminal record, *i. e.,* the convictions dating back to age 14, were close to the heart of his defense of insanity. They constituted an essential link in the proof that he was a constitutional psychopath. And the psychiatrists for both the defense and the State agreed that a pattern of perennial conflict with the law characterizes such a condition of mental incapacity. The significance of the criminal record is recognized by the State in its supplemental brief, which says: "We submit that the only claimed evidence of insanity produced by the defendant related to his anti-social background." The proof of the pattern of criminal behavior was not factually detailed. Neither the circumstances surrounding the events nor the details of the offenses themselves were developed. The references of both psychiatrists and the defendant were to episodes of breaking and entering a gasoline station and a cleaning establishment, escape from confinement, riding in a stolen car, violation of parole, and burglary—without more. So it is evident that in large measure the history of conflict with the law, which served to identify Wolak as a constitutional psychopath, was represented at the trial, and undoubtedly in the minds of the jurors, by the convictions of these various offenses. When

the court instructed them that prior conviction of crime could be used by them only in appraising the accused's veracity and "for no other purpose whatsoever," an adverse effect on the defense became highly probable.

The State urges that even if in the framework of the case the restrictive language of the trial judge might be deemed error, still, considered in context and in a perspective of the whole charge, harmful error did not arise from it. We are unable to agree. Of course, no one can look into the minds of the jurors and discover what reaction or effect was produced on their deliberations. But an appellate court, in appraising the influential consequences of a direction by the trial judge to a jury of laymen that they must disregard the defendant's criminal record in their consideration of the problem of insanity, does so with the nature of the case in mind, as well as the relation of the proof as limited by the charge to the essence of the defense. The basic test is whether the error thus viewed excites a reasonable apprehension that prejudice resulted to the defendant. *State v. McLaughlin*, 47 *N. J. Super.* 271 (*App. Div.* 1957). And where the ultimate issue is life and liberty, we cannot wash the record in cynical acid before making our evaluation. Nor are we authorized to look at the proof, "resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty." See *State v. Orecchio*, 16 *N. J.* 125, 130 (1954).

It is not difficult to conjure up a picture of the jury deliberating upon the defense of insanity. They would realize, of course, that the defendant relied principally upon intoxication and his status as a constitutional psychopath. The former might be discarded because they had been told that voluntary intoxication is no excuse for crime and because the proof did not show that Wolak's mind had become so diseased through drink as to have been rendered incompetent. Then, aside from the fundamental problem of whether the constitutional psychopathic state had brought about an inability to distinguish right from wrong, what was the evidence that such a condition existed? Primarily,

it was his history of convictions of violations of the criminal law; such conflicts representing the symptoms of the disease. But it is entirely likely that a feeling would prevail that the court had removed that record from consideration on the issue of insanity. If so, very little of substance would remain to sustain the defense and excuse the commission of the murder. These considerations point at least to a reasonable apprehension of prejudice stemming from the court's error. *Cf. State v. Dunphy,* 19 *N. J.* 531, 537 (1955); *State v. Shiren,* 9 *N. J.* 445 (1952).

The criticized expression gave birth to another error, also prejudicial. It will be recalled that all of the infractions of the criminal law were committed while Wolak was a juvenile, except the somewhat doubtful burglary conviction mentioned by the psychiatrist as happening in March 1955, at age 20. In delivering the charge the court made no effort to distinguish between crimes and those offenses which the Legislature as a matter of public policy has designated juvenile transgressions. Conviction of the former by persons beyond the statutory juvenile age may be shown at a trial for the purpose of affecting credibility. *N. J. S.* 2*A* :81-12. Not so with adjudications of guilt of juveniles. *N. J. S.* 2*A* :4-39 provides:

"No adjudication upon the status of a child under 18 years of age shall operate to impose any of the civil disabilities ordinarily imposed by conviction, nor shall such a child be deemed a criminal by reason of such adjudication, nor shall such adjudication be deemed a conviction."

Here, the jury was led to believe, by the unqualified reference to "prior conviction of crime," that there is no distinction between the determination of guilt of a juvenile and the conviction of a statutory adult so far as effect on credibility is concerned. They could not be expected to be aware of the difference, nor to appreciate, as the State argues, that the reference to "conviction" meant adult conviction alone. The implicit inclusion by the charge of all the transgressions referred to in the evidence compounded the error already

discussed, to the further detriment of the defendant. The situation is not altered by the fact that Wolak himself introduced the juvenile record. In doing so, it was proper to place reliance upon the legislative policy and mandate that the offenses did not constitute convictions of crime. And it was improper, in the face of that policy, to vest them with the character and consequences of convictions. *Cf. State v. De Paola,* 5 *N. J.* 1, 18 (1950).

Here again the State contends that no prejudicial error has been shown. But the argument overlooks the emphasis that had been placed—and properly so—upon the issue of credibility. Did the accused take "goof balls"? Was he so intoxicated at the time of the shooting that he was incapable of premeditating and deliberating? Did he knowingly go home and procure the gun before entering Pip's Tavern? Was he truthful in saying that it was not on his person when he left home on Saturday evening? Did he have a blackout in the tavern or was he aware of the circumstances of the shooting? Obviously the verdict of the jury depended largely on their impression of his veracity. And when the court told them the prior conviction of crime could be considered in appraising that attribute, the potential for prejudice was inescapable.

Finally, the State points out that no objection was entered to any part of the court's charge. However, such failure does not stand in the way of reversal if the erroneous instruction assumes the proportions of "plain error." *R. R.* 1:5–1(*a*). In our judgment, a mistake of that magnitude has been demonstrated.

Defendant urges also that it was improper to receive in evidence a photograph of the decedent after death. Inspection shows that to describe it as prejudicial or gruesome is hypercritical. *Cf. State v. Bucanis,* 26 *N. J.* 45 (1958).

The last ground presented for review is the allegation that assigned counsel inadequately defended Wolak at the trial. Our study of the record reveals no justification whatever for the charge. We deplore the tendency—which appears entirely too often in the claims of prisoners after

conviction—to criticize members of the bar who have labored earnestly and well in their behalf and in most cases without compensation. *State v. Bentley,* 46 *N. J. Super.* 193 (*App. Div.* 1957).

The judgment of conviction is reversed and a new trial ordered.

WEINTRAUB, C. J. (dissenting). The psychiatrists agreed that defendant is a constitutional psychopath. Their testimony differed as to mental capacity essentially by reason of the different hypotheses upon which they testified. The State's witness was confined to the relationship of that medical condition to defendant's general capacity to differentiate between right and wrong. He was not asked to express his view with respect to the impact of liquor and "goof balls" upon the defendant's mental capacity, either considered alone or in conjunction with the underlying psychopathic condition. The defense witness, on the other hand, nowhere suggested that the psychopathic state alone impaired defendant's legal capacity. Rather, as I read his testimony, the psychopathic state explained defendant's use of liquor and "goof balls," and he attributed the lack of legal capacity at the time of the homicide to the influence of alcohol and "goof balls," actually on the basis of what the defendant factually asserted to have been their influence upon him.

As the majority opinion points out, voluntary intoxication is not a defense, and if we assume that "goof balls" are narcotics (the record is vague in this regard), the same rule doubtless would apply to voluntary use of drugs. *Weihofen, Mental Disorder as a Criminal Defense* (1954), *p.* 128. Our cases do not suggest that intoxication will be given a different role if the drive to drink has some psychopathic origin, and the majority opinion does not hold that it should. Thus, as our law now stands, the use of liquor or narcotics may be shown only to meet the State's claim that the homicide, presumptively murder in the second degree, was in fact murder in the first degree.

The trial judge's charge with respect to insanity and the role of intoxication was eminently fair. He expressly referred to the expert testimony and left it for the jury's consideration without any adverse reflection upon it. After completing a full discussion of those subjects and the elements of the crime, the trial judge proceeded to another subject, namely, the rules bearing upon the jury's evaluation of testimony, and in the course thereof gave the instruction here challenged. That the instruction was intended for the benefit of the defendant cannot be doubted. The court meant thereby to foreclose the possibility that the jury would deem prior convictions to evidence propensity for crime or guilt of the present offense. Defendant was ably represented. His counsel raised no objection, doubtless understanding the charge in the vein I have described.

The majority opinion states that the instruction undermined the defense of insanity by removing the prop upon which the defense psychiatrist rested his finding of the psychopathic condition.

It is difficult for me to believe the jury, already fully instructed as to insanity and the elements of the crime, would have thought the court had returned to the discussion of the basic issues and had modified its charge. Moreover, the content of the challenged instruction did not clash with the charge on the substantive issues. Defendant's prior conflict with society was a basis for the medical finding of a constitutional psychopathic personality, and both the State and defense agreed that finding was correct. The prior offenses, with or without convictions therefor, remained as undisputed facts and the charge could not have been understood to deny them the limited role they had, to wit, to bolster the agreed fact that the defendant was a constitutional psychopath. In short, in the light of the common agreement that defendant was thus psychopathic, I cannot see how the questioned instruction could have been understood to affect adversely the jury's acceptance of that agreed medical fact.

It seems equally clear to me that the error, if such it was, had no bearing upon the outcome. The trial court

charged, wholly apart from the psychopathic state and legal insanity, that intoxication could be found to negative the elements of intent, premeditation or deliberation, and thus hold the offense to second degree. The ultimate question in that regard was whether defendant in fact knew what he was doing, whether he did premeditate, did deliberate upon the design, and did intend to kill. There was evidence from which the jury could conclude that defendant was fully aware of what he was doing and did perform the mental elements required for a first degree conviction. The verdict of first degree constituted a finding that defendant's mental processes were not obliterated. Thereby the jury found against the factual hypothesis upon which the psychiatrist's opinion of legal insanity actually depended, to wit, defendant's assertion that he was unconscious of the critical events.

It is also argued that it was error to charge that the convictions could be considered with respect to credibility. Judgments for juvenile delinquency of course may not be proved to impair credibility, and strictly viewed, the charge was incorrect. But we are concerned with the question whether there was plain error, and I do not think there was.

It is the offending conduct, rather than a conviction therefor, which affects credibility. The rule which limits cross-examination to convictions rather than to criminal conduct itself is designed to avoid the trial of collateral issues which would follow if violations of criminal law, unverified by judgment, could be explored. But if criminal conduct, without conviction, does get into the case, the jury may consider it. *State v. Dunphy,* 19 *N. J.* 531, 537 (1955).

Here the defendant himself offered proof of his misbehaviors to evidence his psychopathic nature. Obviously, that very conduct, and indeed his psychopathic nature itself, would bear upon the trustworthiness of his testimony. His age at the time of his misconduct would be a factor a jury could consider, but I do not see how the subject of misconduct could be taken from the jury's consideration. It is not claimed that the trial judge should have charged

that the jury shall not consider his acknowledged behavior (apart from the adjudications of juvenile delinquency) in deciding whether to believe him. The question, therefore, is whether the misbehavior being in the case on defendant's initiative, the error in telling the jury that the adjudications themselves bear upon credibility was so plainly harmful as to require reversal. The adjudications may have added something to the admitted facts, but if they did, it was not enough to warrant invocation of the plain error rule.

I would therefore affirm the judgment.

WACHENFELD, J., concurring in result.

*For reversal*—Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Chief Justice WEINTRAUB—1.