**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5524-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TINA LUNNEY,

    Defendant-Appellant.

_____

Submitted November 18, 2020 – Decided January 18, 2022

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 10-01-0190.

Joseph E. Krakora, Public Defender, attorney for appellant (Karen A. Lodeserto, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Emily M. M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

A jury convicted defendant Tina Lunney of the first-degree murder of her eighty-one-year-old mother, whom she strangled with a necktie, and the judge sentenced her to forty years in State prison subject to the periods of parole ineligibility and supervision required by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirmed the conviction and sentence on direct appeal, State v. Lunney, No. A-0774-13 (App. Div. Apr. 21, 2016), and the Supreme Court denied defendant's petition for certification, State v. Lunney, 227 N.J. 240 (2016).[1]

At trial, the State proved defendant used her mother's credit card within hours of the murder to pay for a vacation her family was scheduled to take at the end of the week and satisfy an outstanding bill to PSE&G, which had previously turned off electric service to the split-level home defendant shared with her husband and two children. State v. Lunney, No. A-0774-13 (slip op. at 15-16). Defendant's mother lived downstairs, where she was killed. Id. at

---

[1] The United States Supreme Court denied defendant's petition for certiorari on October 2, 2017. Lunney v. New Jersey, 138 S. Ct. 56 (2017).

6-7.  Defendant subsequently staged the crime scene to have it appear a suicide — complete with a forged note.  Ibid.

Defendant was not a suspect when she and her husband gave statements to the police following the discovery of the body.  Id. at 3.  The next morning, however, she wandered away from where she was staying, and her husband reported her missing.  Ibid.  After police discovered her four days later walking near her home in the early morning hours, she confessed to the crime.  Id. at 3-6.

Defendant subsequently attempted to suppress her statement on the ground she could not understand and effectively waive her Miranda[2] rights because she was in a state of "dissociative fugue" disconnected from reality.  Id. at 11.  The State's psychiatrist found no sign of mental illness.  Id. at 11-12.  Following three days of testimony, the judge denied the motion in a comprehensive written opinion.  Id. at 12-15.  Defendant rejected an offer permitting her to plea to aggravated manslaughter with a recommended fifteen-year NERA term and insisted on taking the case to trial.

At trial, defendant contended the police failed to undertake any investigation after she confessed, notwithstanding there was no physical

---

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-5524-18

evidence linking her to the crime, and that many of the details she offered about the murder were not consistent with the physical evidence. She also alleged the chief detective on the case lied and twisted the evidence to make it appear consistent with her statement. Defendant maintained she did not kill her mother and had falsely confessed due to a mental breakdown after she found her mother's body.

The psychiatrist who testified on her behalf at the suppression hearing, Dr. Latimer, also testified at trial. He diagnosed defendant as suffering from bipolar disorder with psychosis, and testified her disappearance, during which she traveled "without any good reason" to the Bloomfield library and Atlantic City, places she used to go with her mother, reflected her "personality ha[d] dissociated itself from reality[] in order to avoid unpleasant affective states." Id. at 10, 22.

On cross-examination, however, Dr. Latimer was forced to concede he'd reviewed the report of a psychiatrist, Dr. Paul, from Ann Klein Forensic Center, who claimed defendant told him "she and her attorney were planning on using the M'Naghten (insanity) defense," and included Dr. Paul's opinion

4

A-5524-18

that "she did not display any deficits in her cognitive functioning."[3] Id. at 23. The State also introduced a letter defendant had written to her husband from jail explaining she'd wanted to kill herself after realizing what she'd done and discussing defense strategy, including asserting an insanity or diminished capacity defense. Id. at 23-24. The State used that evidence to argue defendant was not psychotic but knew what she had done and was trying "to beat her case with [an] insanity defense." Id. at 11.

After her direct appeals ran their course, defendant filed an amended petition for post-conviction relief with assistance of counsel, raising the following issues:

> I. WHEN TRIAL COUNSEL OPENED THE DOOR TO PSYCHIATRIST DR. PAUL'S REPORT, HE UNDERMINED HIS CLIENT'S DEFENSE.
>
> II. TRIAL COUNSEL FAILED TO PRESENT A DIMINISHED CAPACITY OR INSANITY DEFENSE TO THE HOMICIDE CHARGE.
>
> III. TRIAL COUNSEL WAS INEFFECTIVE BY DENYING HIS CLIENT THE OPPORTUNITY TO

---

[3] The M'Naghten insanity defense is based on "the test of insanity . . . laid down in the well-known M'Naghten's Case, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843)." State v. Wolak, 26 N.J. 464, 476 (1958). The "test is whether the defendant, at the time of the doing of the act complained of, was suffering from such a disease of the mind as to be unable to know the nature and quality of the act he was doing, or, if he did know, that he did not know that what he was doing was wrong." Id. at 476-77.

A-5524-18

TESTIFY AT THE MIRANDA HEARING.

IV. TRIAL COUNSEL FAILED TO ASK THE TRIAL COURT TO REOPEN THE MIRANDA HEARING AFTER DETECTIVE PRACHAR'S INCONSISTENT TESTIMONY AT TRIAL.

V. TRIAL COUNSEL FAILED TO OBJECT TO THE STATE'S PREJUDICIAL REMARKS DURING CLOSING.

VI. BECAUSE TRIAL COUNSEL MISLED PETITIONER AS TO THE STRENGTH OF THE STATE'S CASE, PETITIONER REJECTED THE STATE'S PLEA OFFER.

VII. TRIAL COUNSEL WAS INEFFECTIVE WHEN HE ALLOWED THE TRIAL COURT TO IMPROPERLY EXCLUDE HIS CLIENT FROM CERTAIN PRETRIAL PROCEEDINGS.

VIII. DEFENSE COUNSEL'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR AND RELIABLE TRIAL.

She added three more issues in a supplemental pro se brief:

I. PETITIONER'S ASSIGNED COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE A TRIAL BY FAILING TO EFFECTIVELY CROSS EXAMINE THE PROSECUTION WITNESSES.

II. EVIDENCE SEIZED BY POLICE WITHOUT A WARRANT FROM PETITIONER'S POCKETBOOK WAS USED AS EVIDENCE DURING HER INTERROGATION AND AT TRIAL, INSTEAD OF

6

BEING SUPPRESSED, VIOLATING PETITIONER'S CONSTITUTIONAL PROTECTION AGAINST UNREASONABLE SEARCH AND SEIZURE.

III. THE STATE'S FAILURE TO TURN OVER TO THE DEFENSE THE RESULTS OF THE HANDWRITING ANALYSIS ON THE ALLEGED SUICIDE NOTE WAS A VIOLATION OF BRADY V. MARYLAND.

After hearing argument on the petition, the PCR judge determined two issues warranted an evidentiary hearing: "(1) why trial counsel did not interpose a defense of diminished capacity or insanity; and (2) whether defendant's decision to go to trial was an informed decision." Trial counsel and defendant both testified at the hearing.

Trial counsel was a very experienced lawyer, one of the first assistant public defenders in the Essex region, primarily assigned homicide cases. According to him, he discussed possible defenses with defendant, including insanity or diminished capacity, as well as resolving the case with a plea "many times." He testified he made clear to defendant he did not believe "either an insanity defense or any other type of defense where she would otherwise indicate reasons for why she did an act" or the defense they "ultimately . . . went with . . . her denial of killing her mother" would be

7

successful before a jury. He accordingly made clear to her he "thought the plea was the only viable option."

He explained defendant had no mental health history and the only psychiatric records available were those from the jail, which he subpoenaed and supplied to Dr. Latimer, the defense psychiatrist. Although trial counsel testified Dr. Latimer was not able to give an opinion to meet "the M'Naghten standard for an insanity defense," he further claimed defendant did not wish to pursue either an insanity or diminished capacity defense after counsel explained success on either would likely not result in her release but in her involuntary commitment under N.J.S.A. 2C:4-8 and State v. Krol, 68 N.J. 236 (1975).[4] He further explained that notwithstanding defendant's confession, "from day one, her position to [him] was she didn't do it, the statement was not true." Counsel thus concluded he "was limited by her statements to defend the case [in] the only way [he] could which was to say she didn't do it, therefore

---

[4] Defendant submitted a certification in support of her amended petition that she intended "to pursue a diminished capacity/insanity defense until [her] attorney told [her] that should [she] succeed with this defense, it was highly likely that [she] would be subjected to indefinite lifetime civil commitment after trial," and she thereafter "agreed not to present a diminished capacity/ insanity defense," although she claimed that advice was "misleading" and deprived her of "a complete and adequate defense."

someone else must have, because it was clear . . . her mother was murdered, there was no viable option to defend with any insanity or diminished capacity."[5]

Counsel testified he explained to defendant after she lost the <u>Miranda</u> motion that her videotaped confession would be played for the jury, necessitating he call Dr. Latimer to try to limit the damage by testifying, as he had at the hearing, that the statement was unreliable based on defendant's fugue state. Counsel explained, however, "it wasn't just the statement [he] thought made the case bad. There were also multiple areas of consciousness of guilt that arose from her behavior immediately after the incident." Cataloguing those "areas," counsel testified:

> Some of those were addressed by Dr. Latimer, but many of them, such as calling the credit card company and trying to pretend she was her mother at a point in which she was trying to obtain money after her mother was dead. That was a problem.

_____

[5] Counsel also explained a diminished capacity defense, even if he had an expert to support it, which he didn't, "would make no sense," because "unlike insanity which is a complete defense at law, diminished capacity is a partial defense" that would reduce "murder to an aggravated manslaughter. So if she took a diminished capacity to trial, she would risk the murder conviction." Counsel explained that even if defendant "got the diminished capacity ag[gravated] man[slaughter] verdict, it wouldn't be capped at the 15 like the plea offer was, it'd be capped at 30, which is the max under . . . aggravated manslaughter." Accordingly, counsel maintained "it would be self-defeating to use that defense in this case where a plea offer of 15 was already on the table."

There was a letter she wrote to her husband where she basically indicated she thought she may have killed her mother and she wanted her husband to research [an] insanity defense. That was a problem.

The fact that she wrote a suicide note claiming it was her mother's suicide note, suggesting that her mother had committed suicide when, in fact, that wasn't the case. She had been the one who had discovered her mother and turned over the suicide note or at least her husband did. That was a problem.

The fact that she went on this four-day odyssey traveling to parts unknown, but that she recollected most of where she went to the casinos, to the library, and that she potentially wrote another suicide note in her name, that was also a problem.

All those things in counsel's "estimation, argued against somebody who didn't kill her mother." Counsel explained, however, "the whole idea" of a defense based on denial "is to try to [deflect] suspicion away from the defendant." But "[b]ecause there were consciousness of guilt problems," the defense "had to explain all this conduct because it was all incidental to the giving of the statement, and there was no way to do it without using the doctor to suggest that she was acting in some fashion in a mentally ill way." In counsel's view, "[t]hat tended to turn suspicion towards her," which he believed "undermine[d] the [denial] defense," and "for that reason [he] tried to convince her multiple times that the best option was to work out the plea."

A-5524-18

Trial counsel testified he thought the State's offer, a plea to aggravated manslaughter in return for a recommended fifteen-year NERA term, "was extremely generous and favorable, given the proofs in the case," but he was never able to convince defendant of that because it would have required "her to serve an additional 10 or 12 years at that point." According to counsel, "[s]he didn't want to do that. She wanted to be home with her kids. And, so what ended up happening was, [he] told her, the only way [she] could get home is if [she] were found not guilty outright." And although he explained to her "why that was just not going to happen. Needless to say, she persisted on defending the case that way," and refused to accept the plea.

Counsel maintained, however, that he "went over it every time [he] saw her" in the hope she would change her mind or at least allow him to make "a counteroffer or some lesser term that [he] could go back . . . and try to renegotiate the number." He testified the prosecutor left the offer open until the State put on its first witness, and he had a distinct recollection of going "into the cell block" after opening statements and telling her "this was [her] absolute last chance, the prosecutor hasn't called a witness, you've heard how the case is going in, take the deal, this is your last chance, and she said no."

11

He claimed "[t]he only number she wanted to come up with was she wanted to go home. And that just wasn't going to happen under any construct."

On cross-examination, defendant's PCR counsel probed trial counsel's understanding that in order to pursue an insanity defense, defendant needed to be willing to allow her counsel to admit she'd murdered her mother. PCR counsel asked whether trial counsel was "saying that she needed to admit to killing her mother in order to raise an insanity defense?" Trial counsel responded, "That's exactly what I'm saying," explaining "it's not crazy to not kill your mother. It's maybe crazy to kill your mother. But it's not crazy to not do something." He maintained a defendant who claimed someone else committed the crime needed no explanation for the act, because "[y]ou are saying you didn't do it. It's obvious if you didn't do it, then you weren't acting insane when you didn't do it."

Defendant's testimony was brief. She testified trial counsel discussed a diminished capacity or insanity defense, that she was willing to pursue such a defense, and that trial counsel never explained why he elected not to go forward with either.

12

After hearing that testimony, the judge found defendant had not carried her burden under the Strickland[6] standard as to either of the two issues addressed at the evidentiary hearing — whether defendant received ineffective assistance of counsel in connection with her rejection of the State's plea offer and counsel's subsequent failure to pursue a defense of insanity or diminished capacity at trial.

As to defendant's rejection of the plea, the judge accepted trial counsel's unrebutted testimony that he consistently advised defendant to accept the State's generous twelve-year offer, which defendant refused despite his many entreaties. The judge found trial counsel a credible witness, having "a vivid recollection of his discussions with . . . defendant, the strength of the state's case, his discussions with the Assistant Prosecutor and his impressions of . . . defendant." The judge found defendant's rejection of the plea based solely on her desire to avoid prison time — and not on any advice she got from counsel — precluded a finding defendant was prejudiced by counsel's advice. See Lafler v. Cooper, 566 U.S. 156, 163-64 (2012) (holding a defendant complaining that ineffective assistance induced him to reject a plea and go to

---

[6] Strickland v. Washington, 466 U.S. 668, 693-94 (1984).

A-5524-18

trial must establish, among other things, that he would have accepted the plea but for counsel's advice).

As to counsel's failure to assert an insanity or diminished capacity defense, the judge noted trial counsel's testimony as to the difficulties in asserting either successfully, as well as the likelihood that success would not achieve defendant's goal of going home to her kids. The judge acknowledged the evidence in the record of defendant's "mental deterioration" after she was jailed, but also the evidence supporting the State's psychiatrists' view that defendant was malingering. In light of those facts and the evidence the State presented as to defendant's consciousness of guilt in the days and weeks after her mother's murder, the judge found "a reasonable basis for trial counsel's strategic decision not to invoke either defense." See State v. Savage, 120 N.J. 594, 617 (1990) (noting counsel's trial strategy after a thorough investigation of the options in light of the applicable law and relevant facts is "virtually unchallengable") (quoting Strickland, 466 U.S. at 690). The judge additionally concluded defendant failed to prove prejudice by demonstrating to a reasonable probability that asserting either defense would have likely changed the jury's verdict in light of the strength of the State's case. See State v. Pierre,

223 N.J. 560, 583 (2015) (noting the importance of the strength of the evidence in assessing prejudice under <u>Strickland</u>).

Our review of the record convinces us the judge carefully considered the two claims presented at the hearing; her factual findings were reasonably reached on sufficient credible evidence in the record and are thus binding on this appeal, <u>State v. Nash</u>, 212 N.J. 518, 540 (2013). We agree that as to those two issues, defendant failed to demonstrate the performance of her counsel was substandard or that, but for the alleged errors, the result would have been different. <u>Strickland</u>, 466 <u>U.S.</u> at 694.

The jury instruction on insanity requires the jury first find beyond a reasonable doubt the defendant committed the offense. <u>Model Jury Charges (Criminal)</u>, "Insanity (N.J.S.A. 2C:4-1)" (approved Oct. 17, 1988). The judge found trial counsel's testimony credible that defendant was adamant she had not killed her mother, and was unwilling to admit she'd done so, notwithstanding her confession to police. Under those circumstances, trial counsel was not free to argue otherwise in asserting an insanity or diminished capacity defense. <u>See</u> <u>McCoy v. Louisiana</u>, 138 S. Ct. 1500, 1505 (2018) (holding when a defendant expressly asserts a desire to maintain her innocence and does not want to admit guilt, her "lawyer must abide by that objective and

may not override it by conceding guilt," notwithstanding the lawyer's "experienced-based view" that conceding guilt would be the best chance of avoiding even the death penalty). "With individual liberty . . . at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." Ibid.

It was defendant's prerogative, not counsel's, to decide the objective of her defense, which the judge reasonably found was to return home and avoid further confinement. Even if trial counsel believed an insanity or diminished capacity defense was defendant's best option, which he obviously did not as he repeatedly advised her to take the plea offer, he was not free to pursue it because he would have overridden defendant's stated objective to be found not guilty and avoid any further confinement.

Although we affirm the judge's decision to deny relief on the two claims she decided, we agree with defendant that a remand is necessary to permit the court to consider the nine other issues defendant raised but the judge failed to address. Accordingly, we affirm dismissal of defendant's ineffective assistance of counsel claim based on his alleged inadequate advice in

16

connection with the State's plea offer and the failure to present an insanity or diminished capacity defense at trial and remand for consideration of defendant's remaining claims. We do not retain jurisdiction.

Affirmed in part and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5524-18